**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clarissa WILLIAMSON, aka Clarissa
Lewis, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carl MARSHALL, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Karen PARKER, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward DRYDEN, Jr. aka Honky, aka
Hunky, Defendant–Appellant.**

Nos. 93–3389, 93–3399, 94–
3026 and 94–3053.

United States Court of Appeals,
Tenth Circuit.

April 14, 1995.

Tanya J. Treadway (Randall K. Rathbun, U.S. Atty., with her, on the brief), Asst. U.S. Atty., Kansas City, KS, for plaintiff-appellee.

Jill M. Wichlens (Michael G. Katz, Federal Public Defender, with her, on the briefs), Asst. Federal Public Defender, Denver, CO, for defendant-appellant in No. 93–3389.

Carl E. Cornwell (Keith C. Sevedge, Kansas City, KS, with him, on the brief), of Cornwell & Edmonds, Overland Park, KS, for defendant-appellant in No. 93–3399.

Kimberley Kellogg, Overland Park, KS, for defendant-appellant in No. 94–3026.

Bruce C. Houdek of James, Millert, Houdek, Tyrl & Maloney, Kansas City, MO, for defendant-appellant in No. 94–3053.

Before SEYMOUR, Chief Circuit Judge, and BALDOCK and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Defendants-appellants Carl Marshall, Clarissa Williamson, Edward Dryden, Jr., and Karen Parker (collectively "defendants"), were convicted of various drug related offenses. On appeal, they assert infirmities with their respective convictions and sentences. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm.

## BACKGROUND

On May 6, 1993, a federal grand jury in Kansas City, Kansas, returned an eight count indictment charging seven individuals [1] with

---

1. The seven individuals charged were the four defendants, Neville Haynes, Tina McGee and Charles Gay.

conspiracy to distribute cocaine base, commonly referred to as "crack" cocaine, in violation of 21 U.S.C. § 846, as well as seven substantive counts of distributing cocaine base in violation of 21 U.S.C. § 841(a)(1). Count one, the conspiracy count, alleged a single continuing conspiracy among these seven individuals from "on or before January 1, 1986 ... to on or about October 31, 1991."

A joint trial involving the defendants and Mr. Haynes[2] commenced on September 8, 1993, and on October 4, 1993, after a five week trial, the jury convicted the defendants on the conspiracy and substantive distribution counts. The jury, however, was unable to reach a unanimous verdict as to Mr. Haynes and the court declared a mistrial as to the charges against him.

The government's theory of the case, supported by evidence offered at trial, can be summarized as follows. In 1986, Mr. Marshall married Ms. Phyllis Harper, whom he had known since 1985. At the time they met, Ms. Harper had been dealing marijuana and PCP for over a decade. Mr. Marshall joined in his wife's drug dealing operation and he expanded their distribution base to cover the ever-increasing crack cocaine market. Although their crack cocaine distribution began as a relatively small operation, the evidence revealed that in 1987, Mr. Marshall made approximately $10,000 to $15,000 per month in profits.

While Ms. Harper and Mr. Marshall were experiencing professional success in their drug ventures, their personal relationship and their marriage were simultaneously failing. As a result, they decided to establish independent drug distribution networks. They recognized, however, that if they pooled their money, they would be able to purchase larger quantities of drugs from the same supplier, presumably at better prices. They decided it would be in both of their interests to do this, and they subsequently pooled their money when purchasing large volumes of cocaine from their primary suppliers in California.

From 1987 until late September 1988, Mr. Marshall's drug business was becoming increasingly profitable. To meet his buyers' demands, he and his "employees" made numerous trips to California—in custom-designed vans with secret compartments—to make multiple kilogram purchases of powder cocaine. Upon returning to Kansas City, Mr. Marshall and his employees would "cook" the powder cocaine into crack that would then be sold to various buyers.

In late September 1988, while Ms. Harper and Mr. Marshall were in California to make a buy, Mr. Dryden, a twenty-five year veteran of the Kansas City, Kansas, police force who was Mr. Marshall's brother-in-law and who was involved in Mr. Marshall's drug operation, advised Mr. Marshall that the authorities were going to arrest Ms. Harper upon her return to California. Based on this information, changes to the itinerary and travel route were arranged, and Charles Marshall, Mr. Marshall's brother, was given the responsibility for driving the cocaine back from California. Shortly thereafter, Ms. Harper was doused with gasoline and set on fire, resulting in her death. An investigation into her death commenced, and the scope of the investigation encompassed Mr. Marshall and potentially, his drug activities. In reliance on Mr. Dryden's advice, Mr. Marshall decided to cease temporarily his drug operation until the investigation into Ms. Harper's death died down.

As a result, Mr. Marshall's drug operations ceased business from the fall of 1988 until the spring of 1989, a period of seven months. During this time frame, Mr. Marshall enjoyed the fruits of his trade, spending much of his profits on women, poker, a taxi cab company and pleasure trips. After the seven-month hiatus, Mr. Marshall resumed his distribution operation with many of the same people working for him as had worked for him earlier.

When Mr. Marshall resumed his operations in the spring of 1989, he was no longer

---

**2.** One week prior to trial, Ms. McGee pled guilty to the conspiracy charge in exchange for, *inter alia*, her agreement to testify for the prosecution.

Mr. Gay died before the trial began. Thus, the case proceeded to trial against the five other individuals.

dealing on the same scale as he had been before Ms. Harper's death. His purchases from his California suppliers were reduced to one or two kilograms per trip. In October 1991, Mr. Marshall's operation was essentially out of business, as there was little money left to continue to sustain the businesses' operations and Mr. Marshall's own personal crack use and extravagant life-style.

Mr. Marshall, the head of this drug operation, enlisted the services of each of the six other individuals charged in the indictment. The government's theory on the conspiracy count was that each of these individuals was an active participant in his crack distribution ring.

For example, Mr. Marshall headed the operation, purchased the cocaine from suppliers in California and directed the other participants. Mr. Dryden was enlisted for assistance with financial matters and, at least in the government's view, for his help in avoiding detection by law enforcement personnel through his connections with the Kansas City police department. Therisa Ross, one of Mr. Marshall's girlfriends, characterized Mr. Dryden as a "watchdog" for Mr. Marshall's business. In that capacity, Mr. Dryden would run names and car licenses before trips to California, as well as warn the organization about possible busts on their return trips from California and warn everyone about investigations, including the investigation into Ms. Harper's death, and possible sales to undercover officers. He also stored some of the monetary proceeds from the sales at his residence. In return for his assistance, Mr. Marshall would provide him with free crack "crumbs" that were created when Ms. McGee would cook the powder cocaine into crack. Mr. Dryden used these crumbs to support his own drug habit.

Ms. Williamson was hired by Mr. Marshall in 1987 to cook the powder cocaine into crack, to store the cocaine at her residence, which was used as a base of operation, to assist in transporting the cocaine back from California and to sell and deliver most of the operations' crack to its buyers. In exchange for her services, Mr. Marshall paid Ms. Williamson on a commission basis.

Tina McGee, Mr. Marshall's ex-wife and the mother of their son, was hired to perform many of the same functions Ms. Williamson did, including cooking the powder cocaine and storing it at her residence, which was also used as a base of operation. Unlike Ms. Williamson, however, Ms. McGee received a flat salary of $400 per week for her services, rather than a commission. Mr. Marshall also enlisted the services of two of his girlfriends, Ms. Ross and Ms. Parker, both of whom served as cookers and runners. After Ms. Ross and Mr. Marshall had a falling out, Ms. Parker assumed Ms. Ross' duties in exchange for free use of a residence.

Most of the seven substantive distribution counts alleged in the indictment were based on sales by Ms. Williamson and Mr. Marshall to undercover officers. These sales eventually led to the arrest of each of the seven named individuals, and ultimately resulted in the convictions forming the basis for the present appeals.

## DISCUSSION

### I. Challenges to the Defendants' Convictions

#### A. Constitutional Issues

##### 1.

██ Ms. Parker, Mr. Dryden and Mr. Marshall assert the prosecution improperly exercised one of its peremptory challenges to excuse a potential juror, an African–American woman, from the venire. They claim this challenge was made "because of" the venireperson's race, which is an impermissible race-based use of a peremptory challenge, in violation of principles of equal protection under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. *See United States v. Johnson*, 941 F.2d 1102, 1105 & n. 3 (10th Cir.1991). The ultimate issue of intentional discrimination under *Batson* is a question of fact and thus, we review the district court's finding under the clearly erroneous standard. *See United States v. Johnson*, 4 F.3d 904, 913 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994).

The defendants' *Batson* claim in this case arose from the following circumstances. During jury selection, a female African-American juror, Ms. Roland, was selected from the venire as a potential juror. After *voir dire*, the prosecutor, herself an African-American, elected to strike Ms. Roland peremptorily. Counsel for Mr. Haynes, on behalf of all defendants, requested that the court conduct a *Batson* inquiry. The court agreed, and the prosecution then offered three reasons for striking Ms. Roland: (1) she had a specific recollection of having met Ms. Parker, albeit twenty years ago for five minutes; (2) she knew one of the prosecution's witnesses, Jesse Gray, who was a police officer, from school and from church; and (3) she had a cousin and an aunt who had been involved with illegal drugs. Mr. Harris, joined by all defendants, argued to the court that those reasons were "not satisf[ying.]" After considering the parties' respective arguments, the court expressed its belief that this was "a fairly close call ... a very close call," but nonetheless overruled the objection. The court also determined that the prosecution had challenged all other prospective jurors who, like Ms. Roland, knew police officers who were scheduled to testify for the prosecution. Finally, the trial court relied on its personal experience that "the Assistant United States Attorneys for the District of Kansas ... do not routinely strike members of minority groups," although the trial judge expressed some concern over whether it was even proper to consider this information.

During the remainder of jury selection, the prosecution elected not to strike peremptorily Ms. Stallings, another African-American female who had been called as an alternate juror. While Ms. Stallings had a friend on the police force, she did not know any of the prosecution's potential witnesses. Moreover, while she had relatives involved with drugs, she categorically stated she had a negative attitude towards drugs.

The primary argument advanced by the defendants in support of their claim that the district court committed clear error in finding that there was no intentional discrimination is, in essence, that the prosecution elected to strike Ms. Roland but not Ms. Stallings.

▮ In *Batson*, the Court held the Equal Protection Clause prohibits the prosecution from exercising its peremptory challenges in a racially discriminatory manner. *Batson*, 476 U.S. at 85–86, 106 S.Ct. at 1716–17. While the initial burden of establishing a *Batson* violation is on the defendant, *United States v. Hartsfield*, 976 F.2d 1349, 1356 (10th Cir.1992) (citing *Powers v. Ohio*, 499 U.S. 400, 404–05, 111 S.Ct. 1364, 1367, 113 L.Ed.2d 411 (1991)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1344, 122 L.Ed.2d 727 (1993), meeting that burden is irrelevant in cases, such as this, where "the prosecutor offers a race-neutral explanation for [the use of] the peremptory challenges and the trial court rules on the ultimate factual issue of whether the prosecutor intentionally discriminated." *Johnson*, 941 F.2d at 1107 (citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)).

▮ In the present case, the reasons advanced by the prosecution as to why it elected to strike Ms. Roland are facially race-neutral. The proffered reasons related to the prospective juror knowing the defendant, being acquainted with a witness, and being familiar with the subject matter of the trial. These reasons are clearly unrelated to the race of the venireperson, and this is sufficient under *Hernandez* and its progeny to constitute a facially race neutral explanation. *See Hernandez*, 500 U.S. at 359–60, 111 S.Ct. at 1866. Moreover, although the district court believed this was a "close case," it concluded no *Batson* violation had occurred. While the defendants may not believe the prosecutor's reasons were satisfactory, that does not change the fact that those reasons are legally sufficient under applicable precedent to dispel any claim of an equal protection violation. Furthermore, there has been no showing regarding how or why these reasons were pretextual. In the absence of any evidence of pretext, we simply have no basis for overturning the district court's finding that there was no intentional discrimination in the jury selection.

■ Our conclusion that no *Batson* violation occurred is bolstered by the fact the prosecution retained an African–American on the jury. We have previously noted that "although the mere presence of members of a certain race on the final jury does not automatically negate a *Batson* violation, ... it can be a relevant factor, particularly when the prosecution had the opportunity to strike them." *United States v. Esparsen,* 930 F.2d 1461, 1468 (10th Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *see also United States v. Marin,* 7 F.3d 679, 686 & n. 4 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994); *United States v. Mixon,* 977 F.2d 921, 923 (5th Cir.1992); *United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990). For the reasons expressed above, we conclude no violation occurred.

### 2.

Ms. Williamson next asserts her conviction must be vacated because she received ineffective assistance of counsel during the trial.[3] The gravamen of her claim is that trial counsel's closing argument to the jury amounted to a concession of her guilt. She asserts this conduct resulted in a breakdown of the adversarial process and a denial of her Sixth Amendment right to counsel.

After the prosecution rested its case-in-chief, Ms. Williamson elected to testify in her own defense. During direct examination, Ms. Williamson admitted to buying and selling drugs for personal use. On cross-examination, she stated she believed two of the undercover officers were lying and a third officer was only telling the "partial truth" regarding her involvement in the overall conspiracy.

During closing argument, Ms. Williamson's attorney argued to the jury that although Ms. Williamson was an admitted drug user who bought from, and associated with, known drug dealers, the evidence did not demonstrate that she herself was a coconspirator. During the course of his closing argument, counsel also stated, in reference to several of the government's witnesses, that "I'm not going to accuse all of these people of lying. I think some of them were and some of them were not." Counsel also stated, in reference to the testimony of three undercover officers who allegedly purchased drugs from Ms. Williamson forming the basis for substantive distribution counts, "I'm not disputing the fact that this all happened." Counsel made these statements in spite of Ms. Williamson having testified she believed the three officers were lying. Counsel further stated he believed these officers testified as to what actually happened. During rebuttal argument, the prosecutor noted that defense counsel's argument was interesting because he said some things "that his client would appear to disagree with." Ms. Williamson was thereafter convicted.

■ The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall ... have the assistance of counsel for his defence." U.S. Const. amend. VI. While a defendant must ordinarily prove deficient performance by counsel coupled with a showing of prejudice in order to prevail on an ineffective assistance of counsel claim, *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), there is a narrow class of cases where the particular circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

---

3. "The preferred avenue for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack under 28 U.S.C. § 2255." *Beaulieu v. United States,* 930 F.2d 805, 806 (10th Cir.1991). We have recognized, however, that in cases where the defendant is not represented on appeal by the same attorney who represented the defendant at trial and where the ineffective assistance claim does not require further factual development because it is "confined to matters found in the trial record," *id.* at 807, then it is appropriate to resolve the claim on direct appeal. *See id.; see also United States v.*

*Galloway,* 32 F.3d 499, 501–02 (10th Cir.1994), *reh'g en banc granted,* No. 93–4169, Dec. 21, 1994.

In the present case, Ms. Williamson is represented by appellate counsel who was not her trial counsel. In addition, for reasons given below, consideration of this claim is confined to the trial record. Finally, we do not believe our en banc decision in *Galloway* would affect our determination that this issue may appropriately be resolved on direct appeal, and accordingly, we will proceed to the merits of this claim.

*United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984) (footnote omitted). If a defendant can prove such circumstances actually existed, prejudice will be presumed. *Id.* at 659–62, 104 S.Ct. at 2047–49.

▮ There is no question but that the sort of conduct alleged here, *i.e.,* the admission by counsel of his client's guilt to the jury, represents a paradigmatic example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice. *See, e.g., United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir.1991); *Jones v. State*, 110 Nev. 730, 877 P.2d 1052, 1056–57 (1994) (quoting *Brown v. Rice*, 693 F.Supp. 381, 396 (W.D.N.C.1988), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990)). Whether such an admission actually occurred is necessarily fact-intensive. The focus must be on whether, in light of the entire record, the attorney remained a legal advocate of the defendant who acted with " 'undivided allegiance and faithful, devoted service' " to the defendant. *See Osborn v. Shillinger*, 861 F.2d 612, 624 (10th Cir.1988) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948)).

▮ Applying these principles to this case, we first note that regardless of how one characterizes defense counsel's statements, it is clear they do not amount to the types of statements recognized in other cases that have been held to constitute a concession of guilt. *See, e.g., Swanson*, 943 F.2d at 1071, 1074 (defense counsel's statements during closing argument conceding there was "no reasonable doubt" that his client was the perpetrator and that there was "no reasonable doubt" as to an essential element of the offense charged constituted a concession of guilt); *Francis v. Spraggins*, 720 F.2d 1190, 1193–94 & n. 7 (11th Cir.1983) (statement by defense counsel during closing argument in guilt phase of a capital trial that "I think he committed the crime of murder" constituted a concession of guilt), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *Jones*, 877 P.2d at 1055 (statement during closing argument that "the evidence shows beyond a reasonable doubt that the defendant" was the perpetrator was a concession

of guilt); *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504, 505 (1985) (statement by defense counsel that "I don't feel that [the defendant] should be found innocent" was a concession of guilt), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1992, 90 L.Ed.2d 672 (1986).

While counsel's statements in this case may have contradicted one aspect of the defendant's own testimony, this is a far cry from a statement by counsel that there was no reasonable doubt Ms. Williamson was a member of this conspiracy, or that counsel believed Ms. Williamson was a coconspirator. To the contrary, counsel's closing argument is replete with argumentative statements demonstrating counsel's adversarial representation of Ms. Williamson's interests before the jury. Moreover, because the statements in question are not the functional equivalent of a concession of guilt, much of the reasoning underlying that line of authority is simply inapposite. Without a concession of guilt, concerns over conflicts of interest, lessening the burden of proof beyond a reasonable doubt and impermissible pleas of guilty, do not factor into the equation.

The record of counsel's closing argument demonstrates counsel's primary concern was to point to the absence of any evidence linking Ms. Williamson to this drug conspiracy. Counsel specifically asked the jury to pay attention to the conspiracy instructions, to focus on the fact that while Ms. Williamson was a conceded drug user who supported her habit by buying drugs from Mr. Marshall, these facts do not automatically make her a coconspirator, to remember the testimony that Ms. Williamson went on a trip to California to buy furniture and not as part of a "drug run," to consider inconsistencies in the testimony of other witnesses, and to consider carefully the credibility of Willie Myles, an informant. Counsel also acknowledged there was "no doubt" Ms. Williamson "did some things that were wrong," referring to her admission of having purchased and used illegal drugs. Counsel concluded by stating "I think when you review all of the evidence, I think that you will find that Clarissa Williamson is not a conspirator, and I hope that you will return a verdict of not guilty."

An objective assessment of counsel's representations reveals he did not cease to function as an advocate on behalf of Ms. Williamson. He argued to the jury both the evidence in the record and the evidence lacking in the record, as well as arguing the weight and the credibility of the witnesses and the evidence. Counsel also focused the jury's attention on the jury instructions and conceded undisputed facts in the record when necessary. While the reasons for the statements to which Ms. Williamson bases her claim are not entirely clear from the record, they may simply have been recognitions of Ms. Williamson's own statements attesting to her involvement in distributing narcotics to some of the undercover officers, statements corroborated by audio tape recordings.

In a related vein, the Supreme Court has recognized "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments ... and focusing on one central issue if possible." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983) (discussing counsel's duty to raise non-frivolous issues on appeal). This insight is equally applicable to closing arguments made at trial. Counsel, in the exercise of professional judgment, primarily focused on attempting to obtain an acquittal for his client on the conspiracy charge, rather than particular substantive distribution charges. Given the state of the evidence adduced at the trial, and the substance of counsel's closing argument at trial, we are not persuaded that the isolated refusals to contradict certain testimony given by the prosecution's witnesses undermined counsel's otherwise ethically and constitutionally sufficient representation of Ms. Williamson. Therefore, we reject this claim of error.

**3.**

Mr. Marshall and Mr. Dryden next assert their convictions are infirm because of a fatal variance between the allegations of conspiracy in the indictment and the proof of conspiracy offered at trial. They contend a fatal variance was created when the indictment charged a single, continuing conspiracy but the evidence at trial proved, in their view, two distinct conspiracies. They allege the seven-month hiatus between late September of 1988, when Ms. Harper was murdered and Mr. Marshall temporarily ceased his operations, and the spring of 1989, when Mr. Marshall resumed his operations, created a fatal variance because the indictment charged a single conspiracy but the evidence demonstrated two separate conspiracies, severed by the temporal hiatus of seven months. The ultimate questions of whether a variance existed, and whether it was fatal such that relief is required, are questions of law that we review *de novo. See United States v. Cardall,* 885 F.2d 656, 670 (10th Cir.1989).

"[I]t is a fundamental precept of federal constitutional law that a 'court cannot permit a defendant to be tried on charges that are not made in the indictment.'" *Hunter v. New Mexico,* 916 F.2d 595, 598 (10th Cir. 1990) (quoting *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960)), *cert. denied,* 500 U.S. 909, 111 S.Ct. 1693, 114 L.Ed.2d 87 (1991).[4]

Case law recognizes two different types of variances, similar in kind and different in degree. The first type of variance, referred to as a simple variance, "occurs when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Haddock,* 956 F.2d 1534, 1548 (10th Cir.1992) (citations and internal quotations omitted); *see also Dunn v.*

**4.** This principle is derived from the Sixth Amendment guarantee that "the accused ... be informed of the nature and cause of the accusation," U.S. Const. amend. VI, and, at least in federal court, *see Hurtado v. California,* 110 U.S. 516, 528, 4 S.Ct. 111, 117, 28 L.Ed. 232 (1884), the Fifth Amendment guarantee that "[n]o person shall be held to answer for [an] ... otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend.

V; *see also, Hunter,* 916 F.2d at 598 n. 5. The fatal variance doctrine is a necessarily corollary flowing from these constitutional guarantees designed to preserve a defendant's "right to be on notice of the charge brought in the indictment." *Hunter,* 916 F.2d at 598 (citing, *inter alia, United States v. Peterman,* 841 F.2d 1474, 1477 (10th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989)).

*United States,* 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979) ("A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment."). The second type of variance, known as a constructive amendment of the indictment, is "more dangerous" than a simple variance "because it actually modifies an essential element of the offense charged," thereby "effectively alter[ing] the substance of the indictment." *Hunter,* 916 F.2d at 599.

▬▬ With respect to the prohibition against simple variances, which is at issue in this case, we note the mere fact that a variance occurred does not automatically warrant relief. "Where a simple variance exists, 'convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.'" *Hunter,* 916 F.2d at 599 (citing *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)). This follows from the fact that the prohibition against variances is designed to insure notice of the charges; thus, a variance, without more, will not warrant relief as long as the proof corresponds to an offense clearly charged in the indictment because the defendant will have had notice of that charge and cannot claim prejudice.

▬▬ But when the variance rises to the level of a "fatal" variance, relief is appropriate. *See Hunter,* 916 F.2d at 598–99. "A variance 'is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy.'" *Haddock,* 956 F.2d at 1548 (quoting *Hunter,* 916 F.2d at 599).[5] A review of the evidence in this case demonstrates that the defendant has failed to establish a variance. Therefore, we reject this claim.

▬▬ ▬▬ In *United States v. Roberts,* 14 F.3d 502 (10th Cir.1993), we reviewed a simple variance claim in the context of determining whether, as in this case, the government's proof established two separate conspiracies when the indictment charged only a single conspiracy. In rejecting this claim, we refused to adopt a *per se* rule that "'lapses of time … necessarily convert a single conspiracy into multiple conspiracies.'" *Id.* at 511 (quoting *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991)); *see also United States v. Russell,* 963 F.2d 1320, 1322 (10th Cir.) ("[A] conspiracy, once instituted, continues to exist until it is abandoned, succeeds, or is otherwise terminated by some affirmative act."), *cert. denied,* —— U.S. ——, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992); *United States v. Smith,* 833 F.2d 213, 220 (10th Cir.1987) ("The fact that the conspiratorial object was postponed or slowed down does not unequivocally show that the conspiracy was terminated.") (citation and internal quotations omitted).[6]

In *Leavis,* the Fourth Circuit recognized there are many legitimate reasons why a single conspiracy might deliberately experience a lull in its operations. The court stated:

"[a] single overall agreement need not be manifested by continuous activity." … There are a host of reasons for a conspiracy [to import cocaine] to suspend active operations for a period: for logistical reasons, to escape detection, or even to afford its members an opportunity to spend their

---

**5.** In contrast, "[a] variance which rises to the level of a constructive amendment is reversible per se." *Hunter,* 916 F.2d at 599 (citing *United States v. Apodaca,* 843 F.2d 421, 428 (10th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988)).

**6.** Several other circuits have embraced this rule. *See, e.g., United States v. DeVarona,* 872 F.2d 114, 119 (5th Cir.1989) (ten-month hiatus in cocaine supply operation did not create multiple conspiracies); *United States v. Leavis,* 853 F.2d 215, 218

(4th Cir.1988); *United States v. Balistrieri,* 779 F.2d 1191, 1213 (7th Cir.1985) (evidence demonstrated a single conspiracy to operate a gambling business even though business operated during three distinct sports seasons), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986); *United States v. Armedo–Sarmiento,* 545 F.2d 785, 790 (2d Cir.1976) (time lapse not dispositive on the question of whether multiple conspiracies were formed), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 1331, 51 L.Ed.2d 595 (1977).

ill-gotten gains. Our focus must be not on the timing of the conspiracy's operations, but on whether it functioned as an ongoing unit.

*Leavis,* 853 F.2d at 218–19.

 We believe the reasoning in *Leavis* is sound, and applying that reasoning to this case, we cannot say the seven month hiatus here severed the single continuous conspiracy alleged in the indictment into two separate conspiracies. Therefore, no variance resulted. Several of the reasons advanced in *Leavis* for a hiatus in a conspiracy are fully applicable to the case at bar. For example, the primary reason for the postponement of Mr. Marshall's operations was to escape detection. Additionally, Mr. Marshall and other coconspirators spent this time enjoying the fruits of their proceeds. Yet in the spring of 1989, the operations resumed with the same participants, the same conspiratorial objective and the same course of conduct. Under these circumstances, we believe the conspiracy still functioned as a single ongoing entity, and we will not denigrate the simple variance principle by finding a variance here based on the defendants' own conduct in unilaterally suspending their activities to serve their own purposes. Furthermore, the defendants cannot reasonably claim they did not have notice of what the government intended to prove at trial, which, as stated before, is the central purpose behind the prohibition against simple variances. *See Hunter,* 916 F.2d at 599. Accordingly, we find no error.

## B. Evidentiary Issues

### 1.

Defendant Parker reasserts on appeal her claims that the evidence was insufficient to support the jury's verdict convicting her on count six, the charge of aiding and abetting a distribution of cocaine base by Mr. Marshall, and count one, the conspiracy charge. At the close of the government's case-in-chief, counsel for Ms. Parker joined in counsel for Mr. Haynes' Fed.R.Crim.P. 29 motion for judgment of acquittal. Ms. Parker's counsel further requested that in ruling on this motion, the court consider both counts applicable to her client. Ms. Parker thus preserved her right to renew on appeal the sufficiency of the evidence issues pertaining to counts one and six.[7]

 In reviewing a challenge to the sufficiency of the evidence, we review the record *de novo, see United States v. Grimes,* 967 F.2d 1468, 1472 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992), "and ask only whether, taking the evidence—'both direct and circumstantial, together with the reasonable inferences to be drawn therefrom'—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt," *United States v. Urena,* 27 F.3d 1487, 1489 (10th Cir.) (quoting *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986)), *cert. denied,* —— U.S. ——, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). In order to conclude the evidence was insufficient, as a matter of law, to support a conviction, "we must find that no reasonable juror could have reached the disputed verdict." *United States v. Hoenscheidt,* 7 F.3d 1528, 1530 (10th Cir.1993).

### a.

Ms. Parker asserts the evidence against her as to the aiding and abetting count is insufficient to demonstrate how she willfully

---

7. Counsel for Ms. Parker failed to indicate in her brief where she preserved this issue for appellate review by raising it before the district court, in violation of our local rules of appellate procedure. *See* 10th Cir.R. 28.2(d) ("the parties shall include . . . a statement as to where in the record a proper objection was made to the ruling and whether the objection is recorded and ruled upon.") We have, on occasion, treated counsel's noncompliance with this rule as essentially a violation of the *contemporaneous objection rule,* and limited our appellate review of the issue to whether the error complained of constituted plain error, *see, e.g., United States v. Barber,* 39 F.3d 285, 287–88 (10th Cir.1994). Nonetheless, we were able to determine, from an independent review of the 3,700–plus page record in this case, that counsel *did* in fact preserve this issue for further appellate review. In the future, however, all counsel should understand the potentially serious consequences that could result from noncompliance with the applicable rules of appellate procedure.

associated herself with a criminal venture. She asserts Officer Crockett's testimony merely places her at the scene of a drug deal without showing any active participation in a criminal undertaking. The government disagrees, and relies on the trial testimony of Kim Crockett, an undercover officer who participated in the controlled buy that formed the basis for count six of the indictment.

■■■ We recently discussed the government's burden of proof to support a conviction for aiding and abetting under 18 U.S.C. § 2. To support a conviction under this statute, the government must prove, beyond a reasonable doubt:

(1) that the defendant associated herself with a criminal venture; (2) that the defendant participated in the venture as something she wished to bring about; (3) that she sought by her actions to make it succeed; and, lastly, (4) that the proof establishes the commission of the offense by someone and the aiding and abetting by the defendant so charged.

*United States v. Hanson,* 41 F.3d 580, 582 (10th Cir.1994) (citing *United States v. Yost,* 24 F.3d 99, 104 (10th Cir.1994)). It is imperative that the government demonstrate the defendant "willfully associate[d] [herself] with the criminal venture and [sought] to make it succeed through some action on [her] part." *Hanson,* 41 F.3d at 582–83 (citations omitted); *see also Esparsen,* 930 F.2d at 1470; *Roth v. United States,* 339 F.2d 863, 865 (10th Cir.1964).

In this case, Officer Crockett testified he contacted Mr. Myles, an informant with whom he was working, and he asked him to arrange a controlled buy of crack cocaine from Mr. Marshall.[8] Mr. Myles agreed and arranged to have Mr. Marshall meet with Officer Crockett on June 20, 1990. That evening, Officer Crockett drove to a prearranged location and met Mr. Myles. The two men then waited for Mr. Marshall to arrive.

When Mr. Marshall arrived, Officer Crockett observed a woman, whom he knew to be Ms. Parker, in the passenger seat of Mr. Marshall's car. At that time, Mr. Myles and Officer Crockett entered the back seat of Mr. Marshall's car and prepared to make the controlled buy. Mr. Marshall reached into a pouch he was holding in his hand and removed two aluminum foil packages. He then handed the packages between the seats to Officer Crockett. Upon opening the packages, Officer Crockett observed "beige rock like substances, which appeared to be crack cocaine" in each package. Officer Crockett then placed $2,800 in Mr. Marshall's hand, and told him "there's 28." Mr. Marshall handed this money to Ms. Parker and told her to count it and make sure it was all there, which she did. Officer Crockett stated he personally observed Ms. Parker count the money. He also testified Ms. Parker never said anything, but that she remained inside the car during the time when the deal was taking place, and that this transaction occurred within her view.

After this exchange, Officer Crockett asked Mr. Marshall to step out of the car so he could ask him privately for his pager number so in the future, he could contact him directly, rather than having to use Mr. Myles as an intermediary. In fact, the reason Officer Crockett asked Mr. Marshall to step out of the car was because this undercover buy was being videotaped and Officer Crockett wanted to get a picture of Mr. Marshall on tape. Mr. Marshall then gave Officer Crockett two pager numbers, which essentially concluded the deal forming the basis for count six.

■■■ We agree with the general proposition that mere presence at the scene of a drug transaction, without more, is insufficient to support a conviction for aiding and abetting. *See Hanson,* 41 F.3d at 582–83. In this case, however, Officer Crockett's testimony is sufficient to support a finding that Ms. Parker willfully associated herself with Mr. Marshall's distribution of a controlled substance. Moreover, while Ms. Parker's

---

**8.** Nine days earlier, Officer Crockett had asked Mr. Myles to arrange another controlled buy from Mr. Marshall. That buy formed the basis for count four of the indictment and did not involve Ms. Parker.

presence, standing alone, cannot support a conviction for aiding and abetting, it is certainly probative evidence that the jury may consider in determining whether she was guilty of the offense charged. There was testimony she was present during a drug transaction taking place at night, that the transaction occurred within her line of sight and that she counted a sum of money totalling $2,800. In *United States v. Harper*, 579 F.2d 1235 (10th Cir.), *cert. denied*, 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978), we rejected a challenge to the sufficiency of the evidence to support a conviction for aiding and abetting, and in so holding, we stated "[d]efendant's knowledge and participation are to be inferred from ... other testimony as to the amounts of money given him." *Id.* at 1239. In that case, we deemed $600, coupled with the existence of other facts, sufficient to support an inference that the defendant had the requisite knowledge of illegal activity. The same can certainly be said for the $2,800 involved in this case. When all of this evidence is viewed in the light most favorable to the government, we believe it is sufficient to permit the jury to infer Ms. Parker actively and willfully associated with, and participated in, a criminal venture. We also find the evidence sufficient to support a finding that her conduct in counting the money to make sure it was the proper amount was an effort by her to make this venture successful. In short, there was sufficient evidence to permit a finding that Ms. Parker was not simply present at this scene by happenstance, as she asserted at trial.

■ At its core, Ms. Parker seeks to challenge a credibility finding by the jury as to the reasons why she was in the car with Mr. Marshall that evening. But "it is not the function of this Court to reweigh conflicting evidence or consider the credibility of witnesses." *United States v. Pearson*, 798 F.2d 385, 387 (10th Cir.1986) (citing *United States*

*v. Petersen*, 611 F.2d 1313, 1317 (10th Cir. 1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 2986, 64 L.Ed.2d 854 (1980)). By viewing the evidence in the light most favorable to the government, we necessarily resolve any conflicts in the evidence in favor of the government and we assume the trier of fact found that evidence credible. Because we find sufficient evidence to support Ms. Parker's conviction for aiding and abetting Mr. Marshall in distributing crack cocaine as charged in count six. We now consider Ms. Parker's challenge to the sufficiency of the evidence with respect to her conspiracy conviction.

b.

Ms. Parker next challenges the evidence to support her conviction for conspiracy. She asserts the evidence failed to prove she knowingly entered into the conspiracy or that she agreed to achieve the ends of the conspiracy. Because a reasonable finder of fact could reach the opposite conclusion, we will not disturb the verdict.

■ To establish the offense of conspiracy under 21 U.S.C. § 846, the government must prove, beyond a reasonable doubt, "that two or more persons agreed to violate the law, that the defendant knew at least the essential objectives of the conspiracy, that the defendant knowingly and voluntarily became a part of it, and that the alleged coconspirators were interdependent."[9] *United States v. Angulo–Lopez*, 7 F.3d 1506, 1510 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1563, 128 L.Ed.2d 209 (1994); *accord United States v. Riggins*, 15 F.3d 992, 994 (10th Cir.1994); *United States v. Coleman*, 7 F.3d 1500, 1502–03 (10th Cir.1993); *United States v. Anderson*, 981 F.2d 1560, 1563 (10th Cir.1992); *United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992), *cert. de-*

---

9. The Supreme Court recently held "proof of an overt act is not required to establish a violation of 21 U.S.C. § 846." *United States v. Shabani*, —— U.S. ——, ——, 115 S.Ct. 382, 386, 130 L.Ed.2d 225 (1994); *see also United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir.1994). The holding that the prosecution is not required to prove an overt act to support a conviction

under § 846 had been the prevailing rule in this circuit prior to *Shabani*. *See United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988) (cited in *Shabani*, —— U.S. at —— n. *, 115 S.Ct. at 384 n. *). Accordingly, *Shabani* merely reaffirms this aspect of our precedents that pre-date it.

*nied,* —— U.S. ——, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993).

 To establish the first element of a conspiracy—that the defendant agreed to violate the law—the government's evidence must show " 'a unity of purpose or a common design and understanding' with coconspirators to accomplish one or more of the objects of the conspiracy." *Angulo–Lopez,* 7 F.3d at 1510 (quoting *United States v. Kendall,* 766 F.2d 1426, 1431 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986)). The third element of a conspiracy— knowingly and voluntarily joining the conspiracy—must simply be supported by evidence that would permit the finder of fact to infer the requisite *mens rea* on the part of the defendant, that being a conscious and voluntary decision to join in the criminal venture. *See United States v. Falcone,* 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940) ("Those having no knowledge of the conspiracy are not conspirators.").

 The evidence at trial demonstrated that Ms. Parker acted as a runner, delivering drugs to buyers and other members of the conspiracy for distribution purposes. As discussed above, there was testimony she aided and abetted a particular sale of crack to an undercover officer. Furthermore, there was testimony Ms. Parker served as a cook, who processed powder cocaine into crack. In exchange for these services, Mr. Marshall provided financial support to Ms. Parker, which included moving her into a house that Mr. Dryden had helped Mr. Marshall purchase.

When this evidence is taken in its totality and in the light most favorable to the government, it is, in our view, legally sufficient to show Ms. Parker agreed to achieve the ends of the conspiracy and supports the inference that Ms. Parker consciously joined this criminal enterprise.

### 2.

 Mr. Dryden next asserts the district court committed reversible error in admitting, under Fed.R.Evid. 801(d)(2)(E), two tape recorded conversations between Ms. Williamson and Mr. Myles as substantive evidence bearing on his guilt relative to the conspiracy charge. Specifically, he asserts this evidence was improperly admitted for three reasons: (1) Mr. Myles was not a member of the conspiracy; (2) the statements were not made "during the course of" the conspiracy; and (3) the statements were not made "in furtherance of" the conspiracy. While we agree Mr. Myles was not a member of the conspiracy, we conclude, for reasons set forth below, that this error was harmless. Moreover, because we conclude the district court's other preliminary findings under Rule 801(d)(2)(E) were correct, we find no error in the admission of these statements.

 District courts have broad discretion to admit or exclude evidence, and thus, appellate review of evidentiary rulings is limited only to determining whether, in light of the entire record, the district court abused its discretion. *See United States v. Jones,* 44 F.3d 860, 873 (10th Cir.1995) (citing *United States v. Zimmerman,* 943 F.2d 1204, 1211 (10th Cir.1991) and *Boren v. Sable,* 887 F.2d 1032, 1034 (10th Cir.1989)). In addition, heightened deference to the trial judge is appropriate when we review rulings on matters involving the admission or exclusion of hearsay evidence. *See Jones,* 44 F.3d at 873 (citing *Boren,* 887 F.2d at 1033). Of course, while the ultimate issue of the admission or exclusion of evidence is reviewed for an abuse of discretion, preliminary foundational determinations, such as whether statements offered under Rule 801(d)(2)(E) were made "during the course of" and "in furtherance of" a conspiracy, are factual findings, reviewed for clear error. *See Roberts,* 14 F.3d at 514 (citing *Smith,* 833 F.2d at 221–22) (discussing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

 Fed.R.Evid. 801(d)(2)(E) provides: "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay, and is therefore admissible as substantive evidence against all other members of the conspiracy. In order for statements to be admissible under Rule 801(d)(2)(E), the proponent of the evidence must establish, by a preponderance of the evidence, *see Bourjaily,* 483 U.S. at 176, 107 S.Ct. at 2779; *Smith,* 833 F.2d at 221, that:

(1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of, and in furtherance of, the conspiracy. *See Johnson,* 4 F.3d at 914 (citing cases).

In the present case, the district court exercised its discretion and elected not to conduct a *James*[10] hearing prior to trial to determine the admissibility of any coconspirator statements the government would be introducing at trial pursuant to Rule 801(d)(2)(E). *See Roberts,* 14 F.3d at 514 (acknowledging "we have never constructed a fixed formula to govern the *James* prophylaxis."); *see also Petersen,* 611 F.2d at 1329. During the course of the trial, the government sought to introduce two tape recorded conversations between Ms. Williamson, an alleged coconspirator, and Mr. Myles, an undercover informant working for the prosecution. The first conversation took place on October 10, 1990, and the second occurred on January 18, 1991. Over objection, the district court admitted these conversations as substantive evidence bearing on the guilt of all defendants, including Mr. Dryden, pursuant to Rule 801(d)(2)(E). *See United States v. Wolf,* 839 F.2d 1387, 1394 (10th Cir.) ("[S]tatements made by one coconspirator in furtherance of the conspiracy are attributed to each member of the conspiracy"), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). In so doing, the court made the factual determinations that both Mr. Myles and Ms. Williamson were members of the conspiracy, and that the statements were made during the course of, and in furtherance of, the conspiracy.

### a.

The government's evidence as to Mr. Myles demonstrated that prior to May 3, 1988, he had been a drug dealer who purchased part of his supply of drugs from Mr. Marshall. In his own words, Mr. Myles stated, in reference to Mr. Marshall, "I didn't work for him, but I bought from him. I did my own distributing." He characterized Mr. Marshall as one of several suppliers from whom he would buy his drugs, which he would then re-sell to his own buyers in the hopes of "doubl[ing] [his] money." He also indicated he "never dealt for anybody," emphasizing he was an independent drug dealer who set his own prices, made his own profits and whose relationship with Mr. Marshall was that of buyer-seller, not employer-employee. The lack of any evidence showing that Mr. Myles received any form of compensation from Mr. Marshall for his services further corroborates Mr. Myles' testimony that he did not work for Mr. Marshall.

On May 3, 1988, Mr. Myles sold an ounce of crack cocaine to an undercover officer. He had previously sold that same officer a half ounce of crack cocaine on an earlier occasion. Shortly thereafter, Mr. Myles was arrested, at which time it appears he agreed to what can be characterized as an informal arrangement with the Kansas City police force. Although the record is not entirely clear, it appears that in exchange for Mr. Myles' agreement to provide the police with information regarding Mr. Marshall and his operations, the prosecution would consider not bringing charges against Mr. Myles. Some time in 1991, Mr. Myles was asked to cooperate with the federal government regarding Mr. Marshall's operations, and he acceded to this request as well. Based on this evidence, the district court concluded the conversations were admissible under Rule 801(d)(2)(E).

 It is settled law in this circuit that " '[p]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy.'" *United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.) (quoting *United States v. McIntyre,* 836 F.2d 467, 471 (10th Cir.1987)), *cert. denied,* 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). "Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy." *Fox,* 902 F.2d at 1514; *accord Jones,* 44 F.3d at 866 (citing cases). In the absence of some evi-

---

**10.** *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

dence demonstrating that Mr. Myles knowingly and voluntarily joined the conspiracy and accepted the conspiratorial objectives, he cannot be transformed into a coconspirator merely because he bought drugs from a known member of a drug conspiracy. Because the record is devoid of any evidence tending to support an inference that Mr. Myles was a member of Mr. Marshall's drug conspiracy, it necessarily follows that the district court's finding that Mr. Myles was a coconspirator was clearly erroneous.

▆ Although the district court erred in finding Mr. Myles was a member of the conspiracy, this error does not automatically warrant reversal in this case. In fact, a review of Rule 801(d)(2)(E) and the case law interpreting it, demonstrates that the rule does not embody a requirement that the statement in question "be made by a coconspirator *to a coconspirator.*" *United States v. Thompson,* 976 F.2d 666, 670 (11th Cir. 1992) (emphasis added), *cert. denied,* — U.S. —, 113 S.Ct. 3010, 125 L.Ed.2d 701 (1993). Perhaps conspicuous by its absence is any requirement under Rule 801(d)(2)(E) that before coconspirator statements may be admitted, the party to whom the statements were made (*i.e.,* the witness who will testify in court as to the out-of-court statements made by the declarant) must be a member of the conspiracy. Rule 801(d)(2)(E) only requires that the declarant (*i.e.,* Ms. Williamson) and the defendant (*i.e.,* the coconspirator on trial against whom the statement is being offered, who, in this case, is Mr. Dryden) be members of the conspiracy. Relying on this principle, the government asserts it is irrelevant whether the party to whom the statements are made (*i.e.,* Mr. Myles) is a coconspirator as long as the declarant and the defendant are coconspirators. In support of this proposition, the government relies heavily on *United States v. Mealy,* 851 F.2d 890 (7th Cir.1988).[11]

In *Mealy,* the Seventh Circuit held "the fact that one party to a conversation [is] a government informant does not preclude the

admission *of the conspirator's statements* under Rule 801(d)(2)(E)." *Mealy,* 851 F.2d at 901 (emphasis added). We emphasize the italicized language to highlight the fact that the statements of the witness (the person to whom the out-of-court statements were made) are not admissible under this rule, but only the statements of the declarant/coconspirator that were made to the witness. The Seventh Circuit has continued to adhere to this holding of *Mealy* in subsequent decisions. *See United States v. Mahkimetas,* 991 F.2d 379, 383 (7th Cir.1993); *United States v. Robinson,* 956 F.2d 1388, 1394 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992); *see also United States v. Messino,* 855 F.Supp. 973, 977 (N.D.Ill.1994) (following *Mealy* ).

▆ We agree with the reasoning and the analysis articulated by the Seventh Circuit in *Mealy* and its progeny, and we now explicitly hold "that the fact that one party to a conversation is a government agent or informer does not of itself preclude the admission of statements by the other party—if he or she is a member of a conspiracy—under Rule 801(d)(2)(E)." *Mahkimetas,* 991 F.2d at 383 (citations omitted). Stated alternatively, in deciding whether statements are admissible under Rule 801(d)(2)(E), the appropriate focus is on whether the statements were "made by" a member of the conspiracy, and not on whether the statements were "made to" a member of the conspiracy.

Applying these principles to this case, we conclude that although the district court erred in finding that Mr. Myles was a coconspirator, that error was harmless because it in no way affects the admissibility of these statements under Rule 801(d)(2)(E) because whether Mr. Myles was a coconspirator is irrelevant. *A fortiori,* this error could not, and did not, have a substantial influence on the outcome of the trial. *See Jones,* 44 F.3d at 873. This conclusion flows from the undisputed facts that the declarant of the statements, Ms. Williamson, and the defendant against whom the statements are offered,

---

**11.** Although our prior decisions in *United States v. LeRoy,* 944 F.2d 787 (10th Cir.1991) and *United States v. McManaman,* 653 F.2d 458 (10th Cir.1981) might implicitly support our conclu-

sion on this question, we nonetheless agree with the cases from the Seventh Circuit that deal with this issue in a more explicit manner.

Mr. Dryden, were both members of the conspiracy. Under Rule 801(d)(2)(E), this is sufficient to establish this aspect of the foundational requirement for the admission of this evidence.

We must now determine whether the remaining foundational requirements—that the statements have been made during the course of and in furtherance of the conspiracy—have been satisfied as well.

### b.

We summarily reject Mr. Dryden's argument that these statements were not made "during the course of" the conspiracy. He contends that in May of 1988, when Mr. Myles was arrested and agreed to become an informant, Mr. Myles' participation in the conspiracy, if any, terminated and therefore, any statements he made were not made "during the course of" the conspiracy.

This argument is misdirected, however, because it wrongly focuses on Mr. Myles, rather than the declarant, Ms. Williamson. It is Ms. Williamson's statements that the government contends were properly admissible under Rule 801(d)(2)(E), and not Mr. Myles' statements. In fact, the preceding discussion makes it abundantly clear that Mr. Myles' statements are not admissible under Rule 801(d)(2)(E). Once the proper focus of this inquiry is defined, it cannot reasonably be disputed that Ms. Williamson's statements, which were made in October of 1990 and January of 1991, were well within the time frame of the conspiracy at issue. Therefore, we agree with the district court's finding that this foundational requirement was satisfied.

### c.

The final argument advanced by Mr. Dryden on this issue is that the statements in question were not made "in furtherance of" the conspiracy. In essence, the statements by Ms. Williamson to Mr. Myles, which were offered as evidence against Mr. Dryden, fall neatly into four categories. The statements relate to: (1) identifying the names and roles of other members of the conspiracy; (2) avoiding detection by law enforcement personnel; (3) allaying the concerns and fears of Mr. Myles in order to maintain his confidence and trust; and (4) inducing the continued participation of Mr. Myles. We address, and ultimately reject, Mr. Dryden's arguments that these statements were not "in furtherance of" the conspiracy.

First, statements identifying members of a conspiracy are statements "in furtherance of" a conspiracy, *see United States v. Caro*, 965 F.2d 1548, 1557 (10th Cir.1992), as are statements discussing the particular roles of other coconspirators. *See United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987) ("Ordinarily, a statement that identifies the role of one co-conspirator to another is in furtherance of the conspiracy."); *see also United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir.1989) (statement identifying coconspirator as the source of the supply of drugs is a statement "in furtherance of" the conspiracy).

Second, statements by Ms. Williamson identifying Mr. Dryden as a member of the conspiracy, and describing his function in assisting the organization in avoiding detection by law enforcement, are also "in furtherance of" the conspiracy for reasons stated in the preceding paragraph. They are statements of identity and of a particular individual's role in the conspiracy. Furthermore, "conspiracies, by definition, are formed to commit criminal acts.... Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir.1989).

Third, our decision in *Perez* recognizes that statements by a coconspirator designed to allay the fears and suspicions of another individual are statements "in furtherance of" the conspiracy. *See United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir.1993). The transcripts of the recorded conversations demonstrate Mr. Myles expressed concerns over Mr. Dryden's trustworthiness, at which time Ms. Williamson explained to him why his concerns were unfounded. These statements clearly fall within the ambit of Rule 801(d)(2)(E).

■ Fourth, *Perez* also supports the district court's finding that Ms. Williamson's statements attempting to induce Mr. Myles' future involvement with Mr. Marshall were statements made "in furtherance of" the conspiracy. *See Perez*, 989 F.2d at 1578. Accordingly, we conclude the district court's factual findings that these statements were "in furtherance of" the conspiracy are amply supported by the record.[12]

■ Finally, Mr. Dryden makes vague references to the unfair prejudice resulting from the admission of these statements. Even construing this argument as a claim under Fed.R.Evid. 403, we are not persuaded Mr. Dryden has carried his burden of demonstrating that he suffered any "unfair" prejudice from the admission of these statements, *see United States v. Flanagan*, 34 F.3d 949, 953 (10th Cir.1994), especially given the probative value for which these statements were introduced. Therefore, we find no abuse of discretion under Rule 403 in the admission of these statements. *Id.*

3.

■ Ms. Williamson next asserts the prosecutor improperly cross-examined her by asking her questions that required her to testify that several of the prosecution's witnesses who testified were lying.[13] Because no objection was raised to this line of cross-examination by trial counsel, our review is limited to determining whether this examination constituted plain error. *See United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (discussing Fed.R.Crim.P. 52(b)). " 'To constitute plain error, the district court's error must have been both "obvious and substantial." ' " *Barber*, 39 F.3d at 288 (quoting *United States v. Brown*, 996 F.2d 1049, 1053 (10th Cir.1993)). The substantiality requirement of the plain error rule embodies a requirement that the defendant prove prejudice attributable to the error. *See Olano*, —— U.S. at ——, 113 S.Ct. at 1778.

In support of her claim of prosecutorial misconduct, Ms. Williamson relies exclusively

---

12. To the extent Mr. Dryden raised and preserved a claim that the admission of these statements violated his constitutional rights under the Confrontation Clause of the Sixth Amendment, a claim separate and distinct from his evidentiary claim as to the admissibility of these statements, this argument is without merit.

It is a fundamental principle that " 'the Confrontation Clause is not violated by admitting a declarant's out-of-court statements as long as the declarant is testifying as a witness and [is] subject to full and effective cross-examination.' " *United States v. Tome*, 3 F.3d 342, 352 (10th Cir.1993) (citing *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970)), *rev'd on other grounds*, —— U.S. ——, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). The Confrontation Clause only insures the *opportunity* for cross-examination, *see Tome*, 3 F.3d at 352 (emphasis in original) (citing *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)), and because the declarant, Ms. Williamson, testified at trial, Mr. Dryden was thus afforded the opportunity to cross-examine her. Therefore, this claim is without merit.

13. The cross-examination of Ms. Williamson forming the basis for this claim was the following exchange between Ms. Robinson, the prosecutor, and Ms. Williamson, the defendant:

Q. Ms. Williamson, did you sell drugs, too?
A. No, I didn't. I bought drugs.
Q. So when [Officer] Jesse Gray testified that he and Jeffrey Bagsby both bought drugs from you on September 1, 1988, *he was lying?*

A. I don't recall even meeting Jesse Gray, at that time. I don't recall even ever seeing that man till I saw him on this stand.
Q. And on July 9, 1991, when [Agent] Tim Jones said he—he got crack cocaine from you on that date, *was he lying?*
A. Yes, he was . . . . .
. . . .
Q. So you're telling the jury, then, *that Special Agent Jones was lying* when he said he bought drugs from you on September 5th.
A. Yes, he is.
Q. So all of the officers are lying, in other words, both Jesse Gray, Tim Jones. How about [Officer] Kim Crockett, on June 13th, *was he lying* when he said that you were—
A. No, I—I admit to—when Kim—Kim Crockett showed up to my house and I—at the time, I was just thinking of that will be a way for me to get some of his cocaine, and I did offer to go out to—and bring it in the house to give to him.
. . . .
Q. So Kim Crockett's testimony about how that transaction occurred on June 13th, *he's not telling the truth*, either.
A. He's telling partially the truth. He's not telling all the truth.
(Emphasis added.) During closing argument, the prosecutor again made reference to this line of cross-examination, stating "[r]emember what [Ms. Williamson] said? I don't—I've never met Jesse Gray. Kim Crockett is lying. Tim Jones is lying. Everybody is lying."

on a line of cases from the Second Circuit, beginning with the decision in *United States v. Richter*, 826 F.2d 206 (2d Cir.1987). Because the principle enunciated in *Richter* is an issue of first impression in this circuit, we begin our analysis with a discussion of *Richter* and its progeny.

In *Richter*, the Second Circuit stated "[d]eterminations of credibility are for the jury ... not for witnesses ... [and therefore] [p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." *Richter*, 826 F.2d at 208 (citations omitted). The court admonished prosecutors "to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *Id.* at 209 (citations omitted).

The facts in *Richter* demonstrated that during cross-examination of the defendant, the prosecutor asked several questions designed to make Mr. Richter to testify that an FBI agent was either mistaken or lying. *Id.* at 208. The court indicated that if the basis for claiming reversible error was only the questions asked of the defendant on cross-examination, the court "might be inclined to overlook the impropriety." *Id.* But because the prosecutor went further in harping on this issue before the jury, the sum total of the prosecutor's actions was deemed to be sufficiently egregious to constitute plain error warranting a new trial. *Id.* at 208–10.

The additional conduct by the prosecutor besides the cross-examination of the defendant involved calling another FBI agent as a rebuttal witness "for the purpose of corroborating [the first agent's] testimony, which the prosecutor already had forced the defendant to label as false," *id.* at 208; and highlighting the discrepancies between the defendant's statements to the agents and the defendant's own testimony during closing argument, including a statement that the jury could determine Mr. Richter was not telling the truth " 'because if he is, then these two agents, over and over again, committed perjury.' " *Id.* at 209.

The Second Circuit has revisited *Richter* on five separate occasions. In *United States v. Durrani*, 835 F.2d 410 (2d Cir.1987), the

court emphasized that reversal in *Richter* was warranted because of a combination of facts, including the questions asked on cross-examination and the statements made during closing argument. *Id.* at 424.

In *United States v. Kiszewski*, 877 F.2d 210 (2d Cir.1989), the court distinguished *Richter* by noting that reversal was required in that case because of the cumulative effect of the cross-examination, the calling of a rebuttal witness and the emphasis on the discrepancies that were highlighted during closing argument. *Id.* at 217. The court also indicated that the issue in *Richter* did not turn on the veracity of the FBI agents, whereas in this case, a prosecution for making false declarations, "truthfulness was the central issue." *Id.*

In *United States v. Scanio*, 900 F.2d 485 (2d Cir.1990), the court again distinguished *Richter* on its facts. While acknowledging the rule in *Richter* was "not limited to situations where the defendant is asked to comment on the testimony of *government agents*," *id.* at 493 (emphasis added), the court believed this fact raised "special concern[s]" because of the "heightened credibility of government agents," *id.*, concerns not present when the defendant is asked to comment on the veracity of non-governmental witnesses. Furthermore, the court in *Scanio* distinguished *Richter* because the prosecutor had not highlighted the improper cross-examination during closing argument. *Id.*

In *United States v. Weiss*, 930 F.2d 185 (2d Cir.), *cert. denied*, 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991), the Second Circuit continued to distinguish *Richter* on the grounds that the witnesses as to whose credibility the defendant was asked to comment on were not law enforcement officials, coupled with the fact that no rebuttal witness was called to emphasize the cross-examination, and "the prosecutor did not, in his summation, state that a verdict for Weiss was essentially a finding that all of the government's witnesses were lying." *Id.* at 195. As a result, although the prosecutor's cross-examination was "confrontational and abrasive, [it] fell short of depriving Weiss of a fair trial." *Id.*

In *United States v. Gaind,* 31 F.3d 73 (2d Cir.1994), the Second Circuit's most recent interpretation of *Richter,* the court yet again "[did] not regard *Richter* as controlling the decision." *Id.* at 77. The court distinguished *Richter* based on the "significant difference" between asking the defendant whether the witness was lying or whether the witness was simply mistaken, a distinction recognized in *Richter,* and the fact that the witnesses whose testimony were in issue were not law enforcement agents. *Id.* After reviewing the *Richter* line of cases, and ultimately rejecting Mr. Gaind's claim of error, the Second Circuit observed that "defendants invoking *Richter* have not succeeded in obtaining reversal of their convictions when the starkly offensive prosecutorial delinquencies in *Richter* were not replicated." *Id.* (citing all of the cases discussed above).

In reviewing these cases, it becomes readily apparent that the Second Circuit has been very reluctant to expand the scope of the *Richter* decision beyond its narrow and specific facts. The statement in *Gaind,* which is the most recent decision interpreting *Richter,* that relief will not be warranted unless the defendant can demonstrate the presence of the same "starkly offensive prosecutorial delinquencies" found in *Richter, Gaind,* 31 F.3d at 77, essentially limits *Richter* to its facts.

 Although we are not particularly persuaded by the reasoning of the court in *Richter,* this case does not require us to decide whether its principle should be embraced as the law of this circuit.[14] Even assuming, *arguendo,* that we agreed with *Richter* and its progeny, the conduct of the prosecutor here was not identical to the "starkly offensive" conduct of the prosecutor in *Richter.* To be sure, the prosecutor in this case did pose questions to the defendant requiring her to testify that the officers were lying, and did refer to this testimony in her closing argument. But here, as in *Weiss,* the statements made during closing argument

did not expressly state that a verdict for the defendant would require a finding that all of the government's witnesses were lying.[15] Furthermore, as in *Weiss,* the prosecutor did not call a rebuttal witness to emphasize the cross-examination of the defendant. Under *Richter* and its progeny, these factual distinctions are sufficient to distinguish *Richter* from the present. Accordingly, even if we adopted the *Richter* rule, as presently interpreted, we would nonetheless hold that the prosecutor's cross-examination here was "confrontational and abrasive," *Weiss,* 930 F.2d at 195, but did not constitute plain error.

## II. Challenges to the Defendants' Sentences

The defendants next challenge the district court's decisions to either grant or deny particular offense level and criminal history category adjustments in calculating their respective sentences.

### A.

Ms. Parker and Mr. Dryden each requested a two-level reduction in their offense levels under U.S.S.G. § 3B1.2(b) because they were "minor" participants. The district court denied their requests.

 "It is the defendant's burden to establish, by a preponderance of the evidence, [an] entitlement to an offense level reduction under § 3B1.2." *United States v. Santistevan,* 39 F.3d 250, 254 (10th Cir.1994). The district court's findings concerning a defendant's role in a particular offense are factual findings, reviewed only for clear error. *See id.* at 253 (citing cases). A finding of fact is clearly erroneous if it is " 'without factual support in the record, or if after reviewing the evidence we are left with the definite and firm conviction that a mistake has been made.' " *United States v. Phelps,* 17 F.3d 1334, 1337 (10th Cir.), (quoting *United States*

---

14. The *Richter* decision has not been embraced by any other federal courts outside the Second Circuit.

15. Although this point may have been suggested implicitly, it is equally plausible to interpret the

prosecutor's statements in this regard as asking the jury to consider and weigh the credibility of the defendant in light of the testimony of the officers.

v. *Beaulieu*, 893 F.2d 1177, 1182 (10th Cir. 1990)), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). The touchstone for determining whether a defendant is entitled to an offense level reduction under § 3B1.2 is the defendant's culpability relative to the other participants in an offense. *See Santistevan*, 39 F.3d at 254 (citing cases).

1.

■■■ Ms. Parker simply asserts her alleged involvement in Mr. Marshall's organization demonstrates she was less culpable than the other individuals who were involved in this operation. The government's evidence, however, showed Ms. Parker was integrally involved in Mr. Marshall's operation as both a cooker of the powder cocaine into crack and as a runner. We have previously recognized the "important function of couriers in drug distribution networks," *United States v. Montoya*, 24 F.3d 1248, 1249 (10th Cir.1994), and on that basis alone, we have denied requests for offense level reductions under § 3B1.2. *Id.* (collecting cases). In this case, the government's evidence demonstrated Ms. Parker's involvement was at least as great, if not greater, than that of a runner or a courier, and as such, we cannot say the district court's refusal to grant her an offense level reduction for minor participation was clearly erroneous.

2.

Mr. Dryden asserts the district court erred in denying his request for an offense level reduction under § 3B1.2 for two reasons. First, he raises a legal question as to the propriety of the standard applied by the district court to assess his relative culpability. Second, he raises a factual challenge to the district court's determination of his respective culpability.

Mr. Dryden's first argument relies on the district court's statement that § 3B1.2 applies to an individual "who is substantially less culpable than the average participant." He contends the district court's use of the modifier "substantially" is unwarranted by the guidelines and resulted in the application of "a more stringent standard to the mitigating role adjustment than directed by the guidelines." The interpretation of the Guidelines presents a legal question that we review *de novo. See United States v. Pettit*, 938 F.2d 175, 178 (10th Cir.1991) (citing *United States v. Tisdale*, 921 F.2d 1095, 1100 (10th Cir.1990), *cert. denied*, 502 U.S. 986, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991)).

In the background to § 3B1.2, the Commission stated "[t]his section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him *substantially* less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (backg'd) (emphasis added). Thus, there is textual support for the district court's use of the term "substantially" in deciding whether Mr. Dryden was entitled to an offense level reduction.

This case, however, does not require us to determine the propriety *vel non* of the use of the modifier "substantially" because even without that term, we do not believe Mr. Dryden was "less culpable" than the other participants in Mr. Marshall's organization. Mr. Dryden attempts to differentiate his participation from that of a runner or courier. We are not persuaded by his proposed distinction.

■■■ The government's evidence demonstrated Mr. Dryden served as a watchdog for Mr. Marshall's operations, keeping everyone informed of possible investigations and warning members of how and when to conduct their business. Furthermore, he served as a financial advisor to the organization, storing a large sum of the proceeds from the sales. On these facts, we cannot say the district court's finding that Mr. Dryden was not less culpable than the other participants is clearly erroneous. While Mr. Dryden's involvement may have been qualitatively different from that of other individuals, the district court rejected his argument, albeit implicitly, that the relative degree and importance of his involvement somehow made him less culpable. Mr. Dryden has not shown how or why this finding is clearly erroneous.

B.

Mr. Dryden next asserts the district court erred in enhancing his offense level two lev-

els pursuant to § 3B1.3 of the Sentencing Guidelines on the ground that he abused a position of public trust that significantly facilitated the commission of these offenses. *See* U.S.S.G. § 3B1.3. The district court applied this enhancement because Mr. Dryden used both his knowledge and his access to information, access he had by virtue of his status as a police officer, to help Mr. Marshall's drug operation avoid detection by law enforcement.

 In *United States v. Queen*, 4 F.3d 925 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1230, 127 L.Ed.2d 575 (1994), we summarized the requirements for the application of this enhancement, stating it is appropriate "only if 1) the defendant occupied a position of trust, 2) the defendant abused this position in a manner that significantly facilitated his or her offense, and 3) abuse of trust is not included in the base level offense or specific offense characteristics pertaining to the defendant's crime." *Id.* at 927; *see also United States v. Chimal,* 976 F.2d 608, 613–14 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1331, 122 L.Ed.2d 715 (1993). The questions of whether a particular defendant occupied a position of trust and whether that defendant abused that position to facilitate significantly an illegal offense are factual determinations, reviewed only for clear error. *See Queen,* 4 F.3d at 928. But the district court's legal conclusions regarding the application and interpretation of the Guidelines is reviewed *de novo. See Pettit,* 938 F.2d at 178.

 Mr. Dryden's argument is, in essence, that his particular position of trust, as a traffic officer, cannot support an enhancement under § 3B1.3 as a matter of law. In his own words, "[a] hit and run investigator could not contribute to a drug conspiracy." He contends that his position of trust was as a traffic officer, entirely unrelated to drug activities, and therefore, this enhancement should not apply. The government, however, argues that Mr. Dryden breached his "position of trust" by violating "his oath to uphold the law." We agree.

 "Needless to say, a police officer occupies a position of public trust, and the commission of a crime by a police officer constitutes an abuse of that trust." *United States v. Rehal,* 940 F.2d 1, 5 (1st Cir.1991) (citing *United States v. Foreman,* 926 F.2d 792, 796 (9th Cir.1990)). We have recognized "a primary concern of § 3B1.3 is with penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." *Queen,* 4 F.3d at 929 (citing cases). While an officer's status as an officer does not, *ipso facto,* trigger the application of § 3B1.3, *see Rehal,* 940 F.2d at 5, case law on this point recognizes that § 3B1.3 is applicable when an officer uses special knowledge, access, or both, that has been obtained by virtue of his or her status as an officer to facilitate substantially the offenses in question. *See, e.g., United States v. Parker,* 25 F.3d 442, 450 (7th Cir.1994); *United States v. Pedersen,* 3 F.3d 1468, 1469–72 (11th Cir.1993); *Rehal,* 940 F.2d at 5–6.

We agree with these principles and they compel the rejection of Mr. Dryden's argument. The mere fact that he was a traffic officer, rather than a vice officer, does not vitiate the fact that he used his special access to warrant information and his potential knowledge of undercover officers in a conscious and concerted attempt to conceal and protect the illegal activities of Mr. Marshall's organization. This is "precisely" the type of conduct that the enhancement under § 3B1.3 was designed to cover, *see Rehal,* 940 F.2d at 5, and we therefore reject Mr. Dryden's claim of error.

### C.

Ms. Williamson next argues the district court erred in calculating her criminal history score. Specifically, she contends it was improper to enhance her score one point, from three points to four points, thereby raising her criminal history category from level II to level III. She believes the prior sentence that the district court relied upon to increase her criminal history score was improperly counted under § 4A1.2.

In 1990, Ms. Williamson was sentenced in Kansas state court for possession of cocaine. On appeal, she asserts this sentence should not have been used to increase her criminal

history score because it was part of the same conduct involved in the instant offense. No objection to this calculation was raised before the district court, however, and therefore, our review is limited to determining whether the district court committed an "obvious and substantial" error. *See* Fed.R.Crim.P. 52(b); *Barber*, 39 F.3d at 288.

■ Section 4A1.1 of the Guidelines is used to determine a defendant's criminal history category. Various subsections provide that criminal history points should be assessed for "prior sentence[s]" imposed on a defendant. *See*, U.S.S.G. § 4A1.1(a)–(c). On November 1, 1993, the Sentencing Commission amended the application notes to § 4A1.2 and spoke directly to the issue of determining whether a prior sentence was part of the instant offense. The amendment added a sentence to the end of application note 1 to explain that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 4A1.2, comment. (n. 1). This binding statement by the Commission was designed "to avoid double counting and ensure consistency with other guideline provisions." U.S.S.G. App. C, ¶ 493.

U.S.S.G. § 1B1.3 contains several definitions of the phrase "relevant conduct." In cases where the "offense[ ] [is] of a character for which § 3D1.2(d) would [apply]," such as this case, where the defendant's offense level depends on the quantity of drugs, *see* U.S.S.G. § 3D1.2(d),[16] then "relevant conduct" includes "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Considering the language and the purpose behind the amended version of § 4A1.2, it is apparent our analysis must focus on whether the

prior sentence in question was considered by the sentencing court in calculating the defendant's offense level because the prior sentence involved conduct relevant to the instant offense. If the prior sentence was actually considered by the court in calculating the defendant's offense level, then the amendment to note 1 of § 4A1.2 clarifies that the prior sentence may not be used to enhance the defendant's criminal history score.

It is clear from Ms. Williamson's presentence report that her prior sentence in Kansas state court was not considered relevant conduct for the purpose of calculating her offense level. The only mention of this prior sentence was under the section of the report entitled "Defendant's Criminal History." Accordingly, we cannot say that the district court's decision to add one criminal history level for this sentence constituted plain error.

### D.

Ms. Williamson asserts the district court erred in failing to make appropriate findings as required by Fed.R.Crim.P. 32(c)(3)(D).[17] Her primary contention is the presentence report mischaracterized the substance of the trial testimony of Eddie Freeman regarding his knowledge, if any, of the purpose of the trips to California by Mr. Marshall and others, including Ms. Williamson. She contends Mr. Freeman denied knowledge of the purpose of these trips; however, the presentence report stated "Carl Marshall paid [Mr. Freeman] to drive Mr. Marshall to California *to obtain cocaine*." (Emphasis added). Ms. Williamson contends this statement mischaracterized Mr. Freeman's testimony "to make it more damaging [to her]."

Ms. Williamson raised this objection in the district court, but the court made only a general finding that "the Presentence Inves-

---

16. Paragraph 90 of Ms. Williamson's presentence report expressly acknowledges that her counts of conviction were grouped under § 3D1.2(d).

17. Fed.R.Crim.P. 32(c)(3)(D) provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part

thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

tigation Report, as corrected or modified by the Court, and the previously stated findings are accurate." She contends this was error because the language of Rule 32(c)(3)(D) requires a specific finding.

■ We have held a district court may not satisfy its obligation under Rul 32(c)(3)(D) by making a general finding as to the accuracy of the matters contained in the presentence report when the defendant makes a specific objection thereto. *See United States v. Pedraza*, 27 F.3d 1515, 1530 (10th Cir.) (citing *United States v. Roederer*, 11 F.3d 973, 981 (10th Cir.1993)), *cert. denied*, — U.S. —, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994). But while Ms. Williamson raised an objection to this statement in the presentence report, she candidly concedes she did not make a separate objection to the district court's failure to make an appropriate finding under Rule ·32(c)(3)(D). Accordingly, our review is limited to determining whether this alleged failure to make a specific finding amounted to plain error, that is, an "obvious and substantial" error. *See* Fed.R.Crim.P. 52(b); *Barber*, 39 F.3d at 288.

■ Assuming, *arguendo*, that the district court did in fact fail to comply with the mandatory requirements of Rule 32(c)(3)(D),[18] we have found no case law holding that a violation of this rule rises to the level of plain error. Therefore, we hold any error here does not constitute the type of "exceptional circumstance[ ]" to which Rule 52(b) applies; *See United States v. Mitcheltree*, 940 F.2d 1329, 1333 (10th Cir.1991).

### E.

Mr. Dryden, Ms. Williamson, and Mr. Marshall next assert the district court erred in calculating the quantity of drugs attributable to each of them for purposes of calculating their respective sentences.

### 1.

Mr. Dryden challenges the amount of drugs attributed to him for purposes of calculating his base offense level. The presen-

tence report attributed approximately one kilogram of powder cocaine and one half a kilogram of cocaine base to Mr. Dryden. When these amounts were converted to marijuana, it resulted in approximately 22,000 kilograms, corresponding to a base offense level of 36. *See* U.S.S.G. § 2D1.1(c).

The government objected to this calculation, claiming it underrepresented the amount of cocaine that should be attributed to Mr. Dryden. The district court sustained, the objection and, in accordance with the government's suggestion, attributed the entire amount of drugs involved in this conspiracy, nine and one-half kilograms of cocaine base and nine and one-half kilograms of powder cocaine, to him. Mr. Dryden claims "[t]he approach of the probation officer is a much more reasonable and realistic one" because he "had nothing to do with the purchase of cocaine, processing of cocaine or distributing it and thus his relevant conduct is not co-equal with that of the entire conspiracy."

■ In determining the quantity of drugs attributable to particular members of a conspiracy, the sentencing court must focus on the defendant's own relevant conduct. As we have stated "[w]hen several defendants are convicted of conspiracy, the relevant conduct for purposes of sentencing is not necessarily the same for every participant." *Coleman*, 7 F.3d at 1504 (citations and internal quotations omitted). "The Guidelines require examination of the scope of the defendant's agreement to undertake joint activity and of the reasonable foreseeability of co-conspirators' criminal conduct." *Id.* These predicate findings are factual in nature and are reviewed only for clear error. *See id.*

■ While Mr. Dryden's role in this conspiracy has already been discussed in some detail, it can safely be said he acted as a watchdog and an advisor to Mr. Marshall, rather than a seller or cooker. Although this conduct may be qualitatively different from that of the other participants, Mr. Dryden's joint undertaking was nonetheless as broad

---

18. The rule states, in relevant part, that "the court shall" make appropriate findings or enter a determination that no such finding is necessary because the matter was not relevant to the ultimate sentence. *See* Fed.R.Crim.P. 32(c)(3)(D).

as the conspiracy itself. Furthermore, there was no evidence Mr. Dryden took any steps to attempt to limit his participation or involvement in this conspiracy to discrete instances or acts. Therefore, while § 1B1.3 says that the scope of the joint undertaking is not necessarily coextensive with the scope of the conspiracy, the evidence supported such a finding here.

In addition, it was reasonably foreseeable to Mr. Dryden that his coconspirators were involved in the distribution of 19 kilograms of drugs. Ms. McGee testified Mr. Dryden had direct knowledge she had processed this quantity because he had been present when these amounts were brought to her for processing, and Ms. Ross testified Mr. Dryden was present when she was acting as a courier who would bring cocaine to Ms. McGee for processing. This evidence is sufficient to support a finding that the quantity of drugs involved here was reasonably foreseeable to Mr. Dryden.

In short, Mr. Dryden has simply made no attempt to demonstrate how or why these findings of fact are clearly erroneous. He simply asserts the probation officer's recommendation was more reasonable; however, the issue in this appeal is not which calculation was "more reasonable," but only whether the finding actually made at sentencing is adequately supported by the evidence. Because the record provides support for the district court's findings, we cannot say they are clearly erroneous.

### 2.

Ms. Williamson asserts the district court erred in calculating the quantity of drugs attributable to her because the court improperly double-counted two kilograms that increased her base offense level from 38 to 40. No objection was raised to this calculation before the district court, and therefore, our review is limited to that of plain error. To overcome this hurdle, counsel relies on our decision in *United States v. Smith,* 919 F.2d 123 (10th Cir.1990), which stated "basing a sentence on the wrong Guideline range constitutes a fundamental error affecting substantial rights within the meaning of [Fed.R.Crim.P.] 52(b)." *Id.* at 124. In order to assess whether the district court's calculation in this case constituted plain error, we must review of the district court's methodology on the merits. In so doing, however, we are cognizant that the sentencing court's factual determinations as to the quantity of drugs to be attributed to a particular defendant are factual in nature, reviewed only for clear error. *See Angulo–Lopez,* 7 F.3d at 1511; *Coleman,* 7 F.3d at 1503–04.

The presentence report determined Ms. Williamson should be held accountable for at least half of the total amount of powder cocaine and cocaine base, which was approximately nine and one-half kilograms of each, based on the fact that she actually distributed half the operation's cocaine. Thus, the district court attributed four and three-fourths kilograms of both powder cocaine and cocaine base to Ms. Williamson. The district court then attributed an additional kilogram of each substance to her before calculating her base offense level. Thus, the calculation resulted in the conversion of five and three-fourths kilograms of both powder cocaine and cocaine base into marijuana, which equates to a base offense level of 40.

Ms. Williamson contends it was error to add the additional kilograms because the figure of nineteen kilograms, the total amount involved in this conspiracy of which half (nine and one-half kilograms) was attributed to her, "presumably included [the] two kilograms of cocaine obtained [by Ms. Williamson] in a trip to California [in late June of 1988]."

The government disputes this characterization of the additional two kilograms. It asserts the trial testimony of Ms. McGee was sufficient to permit the sentencing court to conclude, by a preponderance of the evidence, that the two additional kilograms attributed to Ms. Williamson were *not* counted in the nineteen total kilograms processed by Ms. McGee. The government contends nine and one-half of the nineteen total kilograms handled by Ms. McGee, which were properly attributed to Ms. Williamson, were processed between July of 1988 and the fall of 1989. In contrast, the two additional kilograms attributed to Ms. Williamson, which raised the

total to five and three-fourths kilograms of each substance, were based on conduct she participated in prior to Ms. McGee's conversions commencing in July of 1988. Thus, the government asserts the district court did not double-count the two additional kilograms and that the sentencing court's calculation of her base offense level based on the five and three-fourths kilograms quantities was not clearly erroneous.

Contrary to Ms. Williamson's unsubstantiated assertion that these two kilograms "presumably" were included in the nine and one-half kilograms attributed to her, Ms. McGee's testimony provides adequate support to sustain the district court's finding. Ms. McGee testified she began processing cocaine for Mr. Marshall around July 4, 1988, after Ms. Williamson's separate trip to California in June of that year in which she transported the two additional kilograms at issue. Therefore, we cannot say the district court's calculation was clearly erroneous, and *a fortiori*, it did not constitute plain error.

### 3.

■ Mr. Marshall contends the district court erred in determining his base offense level based on the amount of cocaine attributable to him. The district court, relying on the probation officer's calculations, concluded Mr. Marshall was responsible for all of the cocaine base distributed during the course of this conspiracy, approximately nineteen kilograms, which set his unadjusted base offense level at 42. *See* U.S.S.G. § 2D1.1(c)(1). Mr. Marshall asserts that the 18 kilograms of powder cocaine purchased from Ms. Taylor, which was converted into nine kilograms of cocaine base, cannot be reasonably attributed to him because the trial testimony was so convoluted and confusing that this calculation "has no rational or reasonable basis in fact." He asserts he should be found responsible for only up to 49.1 grams, amounts resulting from three of the substantive distribution counts for which he was convicted. We disagree.

■ In arguing his responsibility is limited to a maximum of 49.1 grams, Mr. Marshall attempts to limit his exposure for sentencing purposes to only those quantities that the government proved he personally handled. We have rejected this argument in the past and we continue to do so today. *See, e.g., United States v. Williams,* 897 F.2d 1034, 1040 (10th Cir.1990), *cert. denied,* 500 U.S. 937, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). It is an established principle that "[a]s a member of [an] ongoing conspiracy, [the defendant] is subject to a sentence calculated on a base offense level determined by reference to the actual quantity of drugs involved in the conspiracy provided that [he] knew or should have known that at least such amount was involved." *Id.* at 1041; *see also Angulo–Lopez,* 7 F.3d at 1512. ("The defendant is held responsible for all reasonably foreseeable transactions.") Moreover, the government's burden is only to attribute the quantities of drugs to the various coconspirators by a preponderance of the evidence, and the district court's findings and calculations in this regard are reviewed for clear error. *See United States v. Slater,* 971 F.2d 626, 638 (10th Cir.1992).

■ As in *Angulo–Lopez,* we find it was appropriate to attribute the entire amount of cocaine base to Mr. Marshall in calculating his offense level, given his status as the leader of this conspiracy. *See Angulo–Lopez,* 7 F.3d at 1512. In that capacity, Mr. Marshall made the decisions regarding how much powder cocaine to purchase, when to purchase it, and how and when to process it into cocaine base. Therefore, we find the district court properly determined Mr. Marshall's base offense level to be 42.

### F.

Defendant Parker asserts the trial court erred in denying her request for a downward departure under U.S.S.G. § 5H1.6 "due to her family situation."

■ We have repeatedly held " 'a district court's discretionary refusal to depart downward from the guidelines does not confer appellate jurisdiction under 18 U.S.C. § 3742.' " *United States v. Holsey,* 995 F.2d 960, 963 (10th Cir.1993) (quoting *United States v. Bromberg,* 933 F.2d 895, 896 (10th Cir.1991)). As long as the district court "recognized that it had the authority to depart,

but in its discretion chose not to do so, this court has no jurisdiction to review that decision." *United States v. Sanders,* 18 F.3d 1488, 1490 (10th Cir.1994).

■ Our review of the record indicates the district court did in fact recognize it had the authority to depart downward, and that the court elected not to exercise its authority in this case. Several comments made by the court during Ms. Parker's sentencing hearing are dispositive.

As to No. 7, the request for the departure, the Court declines to depart downward for family circumstances here. Although the Court is unwilling to draw any bright line today where it might find appropriate circumstances, it does not believe that this case fits the criteria....

Here, in this particular case, there are also factors that I think tend to cut in both directions. Ms. Parker's family situation is not entirely a positive from the standpoint of a potential downward departure.

....

This case does not involve the extraordinary nature that would warrant a departure....

....

... So I would decline to depart downward, under these circumstances.

The quoted language above is unambiguous and does not support the assertion the district court did not understand it had the discretion to depart downward or that it did not understand the extent of its discretion to depart downward. *See United States v. Stewart,* 37 F.3d 1449, 1450 (10th Cir.1994). To the contrary, these statements evince a conscious decision by the sentencing court to deny the request for a downward departure because the particular facts of Ms. Parker's situation did not warrant it. We therefore have no jurisdiction to review the district court's discretionary refusal to depart downward.

### G.

■ The final argument, advanced by Mr. Marshall, Ms. Parker and Ms. Williamson, is the now familiar claim that § 2D1.1 of the Sentencing Guidelines, which equates one kilogram of crack to one hundred kilograms of powder cocaine for purposes of sentencing, violates the constitutional guarantee of equal protection because it imposes harsher sentences on African–Americans than on Caucasians.

We have repeatedly rejected each of the arguments necessary to find § 2D1.1 violative of equal protection. Thus, we have rejected the argument that a disparate impact necessarily implies a finding of intentional discrimination, *see Angulo–Lopez,* 7 F.3d at 1509 (citations omitted); *United States v. Thurmond,* 7 F.3d 947, 952 (10th Cir.1993) (citing *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1311, 127 L.Ed.2d 661 (1994), and that the distinction between these forms of cocaine is not a rational distinction. *United States v. Williams,* 45 F.3d 1481, 1485 (10th Cir.1995) (citing *Angulo–Lopez,* 7 F.3d at 1509); *Thurmond,* 7 F.3d at 953; *United States v. Easter,* 981 F.2d 1549, 1558–59 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993).[19] Therefore, we find no constitutional violation.

### CONCLUSION

While each of the defendants has raised numerous claims of error regarding the validity of their respective convictions and sentences, we find none of these claims warrant reversal. Accordingly, we **AFFIRM** the convictions and sentences imposed by the district court.

---

19. No Circuit Court has found the Guidelines' disparate treatment of crack as opposed to powder cocaine to violate equal protection of laws.