# UNITED STATES COURT OF APPEALS

**Filed 8/29/96**

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SCOTT EDWARD FITZPATRICK, also known as Steve Taylor,

      Defendant - Appellant.

No. 95-1417
(D.C. No. 94-CR-398-N)
(District of Colorado)

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHN ANTHONY TAFOYA, also known as John Christopher Stevens,

      Defendant - Appellant.

No. 95-1426
(D.C. No. 94-CR-398-2)
(District of Colorado)

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

EDWARD EGAN SEFIC, also known as Edward E. Sefic, also known as Ed Simmons,

      Defendant - Appellant.

No. 95-1442
(D.C. No. 94-CR-398-1)
(District of Colorado)

---



# ORDER AND JUDGMENT[*]

Before **PORFILIO**, **HOLLOWAY** and **LUCERO**, Circuit Judges.

Scott Fitzpatrick, Edward Sefic, and John Tafoya,[1] the three defendants in these related appeals, were involved in a telemarketing fraud. Defendant Fitzpatrick argues his convictions are the product of a fatal variance and they are not supported by sufficient evidence. All three defendants appeal the district court's calculation of the loss to the victims under § 2F1.1 of the sentencing guidelines. Defendant Sefic also argues that the district court violated his rights to confront adverse witnesses by relying on evidence presented at codefendant Fitzpatrick's trial. We affirm.

## I. Background

Sefic owned and operated a telemarketing business in Englewood, Colorado, called American Estate Planners. He employed Tafoya as the day-shift telemarketing manager and Fitzpatrick as the afternoon-shift telemarketing manager. The telemarketers answered phone calls from out-of-state callers who were responding to a postcard sent by Marketing Resource, Inc., at Sefic's direction. The postcard announced that the recipient

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]At the parties' request, Tafoya's case is unanimously ordered submitted without oral argument pursuant to the applicable rules.

was a "guaranteed award recipient" selected to receive at least one of the following four awards:

1. $17,500.00 cashier's check
2. $15,000.00 of vacation holidays!!
3. $5,000.00 cashier's check!!
4. 25" Sony color TV, Sony rack stereo system & Sony VCR, or $2,500 cashier's check (your choice)!!

To claim the award, the postcard instructed the recipient to call a 1-800 number.

Callers were told by the telemarketers that to receive their guaranteed award, they had to purchase a living trust package. The living trust packages were marketed as a way for callers to avoid attorneys, probate, and estate taxes, and plan for their heirs' financial security. After callers paid for the trust packages, they received their guaranteed award. Although some callers were told they had won a cashier's check, the only award American Estate Planners sent was a travel coupon book, which had been represented on the postcard as "$15,000.00 of vacation holidays." The coupons were for discount hotel accommodations at hotels throughout the world.

The defendants were eventually indicted for mail and wire fraud and aiding and abetting. 18 U.S.C. §§ 1341, 1343, 2. The indictment charged them with misrepresenting the value of the awards listed on the solicitation postcard and misrepresenting the value and utility of the living trust package. Sefic pled guilty to one count of mail fraud and aiding and abetting, Tafoya pled guilty to one count of wire fraud and aiding and abetting, and Fitzpatrick was convicted by a jury of five counts of wire fraud and aiding and abetting.

## II. Variance

3

Defendant Fitzpatrick argues that his convictions for counts 1, 3, 6, and 7 are the product of a fatal variance between the allegations of the indictment and the proof at trial. "The ultimate questions of whether a variance existed, and whether it was fatal such that relief is required, are questions of law that we review de novo." United States v. Williamson, 53 F.3d 1500, 1512 (10th Cir.), cert. denied, 116 S. Ct. 218 (1995).

A variance between the indictment and the evidence at trial "occurs 'when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" United States v. Haddock, 956 F.2d 1534, 1548 (10th Cir.) (quoting Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir. 1990), cert. denied, 500 U.S. 909 (1991))(further quotation and citation omitted), cert. denied, 506 U.S. 828 (1992). Not all variances warrant relief. When a variance has occurred, convictions will be "sustained so long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." Id. (quotation and citation omitted). However, for relief to be granted, a variance must rise to the level of a fatal variance. "A variance is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." Williamson, 53 F.3d at 1513 (quotations and citation omitted).

Regarding counts 1, 3, 6, and 7, the indictment states:

On or about the dates alleged below, . . . defendants herein [Fitzpatrick, Sefic, and Tafoya] and others, for the purpose of executing the above scheme to defraud, and to obtain money, or property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so knowingly and willfully transmitted and caused to be transmitted . . . [interstate phone calls] . . . to the customers identified below . . . and knowingly aided, abetted, counseled, induced, produced and caused such acts, each such act listed below . . .:

4

| Count | Date | Person Called | Defendant |
|-------|------|---------------|-----------|
| 1 | October 31, 1991 | Thomas Crawmer, Sr. | [Fitzpatrick] |
| . . . | | | |
| 3 | December 2, 1991 | Jean M. Bruce | [Fitzpatrick] |
| . . . | | | |
| 6 | December 11, 1991 | Brandy Starkebaum | [Tafoya] |
| 7 | December 23, 1991 | Wayne Brinda | [Tafoya] |

Fitzpatrick insists that the only reasonable interpretation of counts 1, 3, 6 and 7 of the indictment is that on the listed dates, the listed defendant placed a phone call from the offices of American Estate Planners to the listed customer in furtherance of a scheme to defraud. He claims that the government never proved that the calls occurred in that manner. He suggests that the jury might have convicted him based on proof that he ultimately made some calls on dates not listed in the indictment.

We do not agree with Fitzpatrick's interpretation of the indictment. In addition to charging Fitzpatrick with wire fraud, the indictment clearly charged him with aiding and abetting. Therefore, the government did not necessarily have to prove that Fitzpatrick made or received any of the calls alleged in counts 1, 3, 6, and 7, but only that he aided and abetted a scheme in which those calls were made. The government was not required to prove every detail alleged in the indictment, when the language of the indictment went beyond charging the elements of the offense. United States v. Smith, 838 F.3d 436, 439 (10th Cir. 1988), cert. denied, 490 U.S. 1036 (1989). Because the evidence on the aiding and abetting issue corresponds with charges clearly set forth in the indictment, there was no fatal variance.

III. Sufficiency of the Evidence

Defendant Fitzpatrick challenges the sufficiency of the evidence supporting his convictions for five counts of wire fraud and aiding and abetting. "When the sufficiency

5

of the evidence is challenged, the test is whether the evidence and reasonable inferences therefrom, viewed in the light most favorable to the government, would allow a reasonable jury to find guilt beyond a reasonable doubt." United States v. Galbraith, 20 F.3d 1054, 1056 (10th Cir.), cert. denied, 115 S. Ct. 233 (1994). Whether the evidence is sufficient is a question of law that we review de novo. Id.

To establish wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud, and (2) the use of interstate wire communication to facilitate that scheme. Id. "[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994).

A conviction based on aiding and abetting under 18 U.S.C. § 2 requires proof: (1) that a defendant associated himself with a criminal venture, (2) that he participated in the criminal venture as something that he wished to bring about, (3) that he sought by his actions to make the criminal venture succeed, and (4) of the commission of the criminal offense by someone and aiding and abetting that offense by the defendant. Id. at 582.

The government presented ample evidence from which the jury could have reasonably inferred a scheme to defraud and Fitzpatrick's direct participation in and facilitation of that scheme. Although Fitzpatrick was only a telemarketing manager and did not plan or arrange for the postcards offering recipients guaranteed awards, he voluntarily proceeded with the plan to induce sales of the trust package by promising overvalued incentives. The jury heard testimony that Fitzpatrick played some role in developing the misleading and dramatic script that telemarketers used to persuade callers to purchase the trust packages. He instructed telemarketers under his supervision to use

6

that script and placed follow up calls to confirm sales. He knew that the only prize ever awarded by AEP was the booklet of vacation coupons, the so-called "$15,000 in vacation holidays." The evidence suggests that Fitzpatrick knew that the vacation coupons were not worth $15,000. He knew that many customers complained about the vacation coupons. He also knew than the coupons did not provide air fare. He explained to the jury that $15,000 seemed to be a reasonable estimate of the value of the coupons, because the coupons offered free accommodations for 36 vacations. However, since few people can afford airfare for 36 vacations within a few years, the jury might have reasonably determined that Fitzpatrick knew the vacation coupons were worth less than $15,000.

There is also sufficient evidence of the use of interstate phone calls in furtherance of the scheme to defraud. The government proved that all of the calls in contested counts occurred on the dates and with the victims identified in the indictment. Fitzpatrick himself perpetrated the wire fraud alleged in count 2. Evidence establishes that he aided and abetted the wire fraud in counts 1, 3, 6, and 7. He supervised the telemarketers who answered some of those calls, he confirmed some of the calls, and he assisted and promoted the fraudulent scheme against all of the callers alleged in those counts. In summary, after reviewing the entire trial transcript, we conclude that sufficient evidence supports Fitzpatrick's convictions on all five counts.

## IV. Calculation of Loss

All three defendants challenge their sentences on grounds that the district court incorrectly calculated the loss to the victims under the sentencing guidelines, USSG § 2F1.1. "A district court's factual determination of loss under § 2F1.1 is reviewed under a clearly erroneous standard, but the factors the court may consider are reviewed de novo."

7

United States v. Reddeck, 22 F.3d 1504, 1511 (10th Cir. 1994). "We will not disturb the court's factual findings unless they are without support in the record, or unless after reviewing all the evidence we are left with a definite and firm conviction that a mistake has been made." United States v. McAlpine, 32 F.3d 484, 488 (10th Cir.) (citation and quotation omitted), cert. denied, 115 S. Ct. 610 (1994).

Section 2F1.1 increases the base offense level for a fraud offense, to account for the loss caused by the offense. "Loss" is defined as "the value of the property taken, damaged, or destroyed." USSG § 2B1.1, comment. (n.2); see also § 2F1.1, comment. (n.7) (cross referencing § 2B1.1 for meaning of loss). "Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue." § 2B1.1. However, "[w]here the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim." Id.

The measure of loss in a fraud case is "'the net value, not the gross value, of what was taken.'" United States v. Gennuso, 967 F.2d 1460, 1462 (10th Cir. 1992) (quoting United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991)); see also § 2F1.1, comment. (n.7(a)). In Gennuso we endorsed the "out of pocket" method for determining a victim's actual loss. The out of pocket method measures "'the difference between the value of what [the victim] has parted with and the value of what he has received.'" 967 F.2d at 1462 (quotation and citation omitted). We also explained that "the measure of the value of the goods received is the fair market value." Id. at 1463 (citing § 2B1.1, comment. (n.2), which values property taken by its fair market value). The fair market value, in turn, is the amount for which the victim could resell the goods received. See id.

8

at 1462; see also USSG § 2F1.1, comment. (n.7(a)) ("In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.").

In this case the district court recognized that, pursuant to Gennuso, loss equals the amount the victims paid minus the value of the items the victims received in return -- the trust package and vacation coupons. The court found as a matter of fact, however, that the living trust package and vacations coupons were worthless. Because the victims received nothing of value in return for their payment, the court multiplied the number of identifiable victims (587) by the average amount each victim paid ($369), to arrive at a net loss of $206,592. Since the amount of loss was more that $200,000, the district court increased each defendant's base offense level eight levels. See § 2F1.1(b)(1)(I).

On appeal, defendants argue that the district court improperly equated the fair market value of the trust package and vacation coupons to the usefulness of those products to the victims in this case. We held in Reddeck that "the guidelines do not provide for an abstract factoring of a victim's residual and subjective 'satisfaction.' Calculation of lost value requires an objective standard, usually measured by 'fair market value.'" 22 F.3d at 1512. Although we endorsed an objective fair market value approach, we made clear that "a district court is free to use other methods, depending on the requisites of the case, to adequately calculate loss." Reddeck, 22 F.3d at 1513 (citing Gennuso, 967 F.2d at 1463).

Here, the district court appears to have used a subjective standard, taking into account the value the victims actually placed on the trust package and vacation coupons. Regarding the trust package, the court stated:

> From all the evidence that I've heard, including the testimony of the victims at trial, the living trust package was worthless. It was worthless in the sense that the people who received mailings were not people who could benefit from any kind of a living trust arrangement because of their own peculiar circumstances. And when I say peculiar circumstances, I refer primarily to the fact that they were not people of substantial means. They were people whose income and whose assets was such that a living trust package and in particular the living trust package at issue here, could simply not be utilized by them. It was not a benefit to them at all.
> So while one might argue that a fair market value of the package between a willing buyer and willing seller, that is to say someone who wanted and needed a living trust by virtue of his or her circumstances, would be in the hundreds of dollars. These people were not willing buyers and they were not full[y] informed buyers. Fair market value assumes a willing buyer with full knowledge, and these people were not. The victims here were not willing buyers with full knowledge. The nature of the package was not clear to them. When they got the package, they realized that it had no value to them.
> As a matter of fact, I determine that the value of the living trust package was zero.

R. 11, at 23-24.[2]

The court made similar findings regarding the value of the vacation coupons:

> What I've already said about the living will package applies equally to this [vacation] package as well. These victims had nothing that was of value to

[2]The court's written findings are not to the contrary:

> The value of a living trust package depends largely upon the economic circumstances of the person receiving it. A person of substantial means may be able to use such a package to his benefit, but not a single victim from whom I heard during the course of these proceedings was a person of such means. It appears, rather, that the mailings preceding the sale of the packages were sent to persons of very limited means who had no use for a living trust . . . ."

R. 1, doc. 36, at 3.

them because of their peculiar circumstances, and the peculiar circumstances again primarily are pecuniary. It would be simply a perpetuation of the smoke and mirrors nature of this operation to perpetuate the fiction, and it is a fiction, that anybody in these-- the circumstances of these victims could really see any value in that vacation package. It was a value that was severely restricted. The package was severely restricted. and most critically, the victims had to pay their own expenses to get to a point where they could use the vacation package. They could not readily market this package. They couldn't go out on the street and sell it. They couldn't go back to the seller and ask that the package be taken back. So what they were stuck with is a package that had no value to them.

I find that the vacation package had a zero value, wholesale, retail or fair market value.

Id. at 25-26.[3]

While the guidelines do not preclude accounting for the value the victims actually placed on the items received, the district court cannot speculate as to that value. Here, only 7 of the 587 victims testified at Fitzpatrick's trial. Those seven victims, the district court found, were persons of limited means who had no use for a living trust package and could not afford to take advantage of the vacation coupons. Memorandum of Sentencing Hearing, at 3. The district court improperly inferred from the seven testifying victims that the trust package and vacation coupons were worthless to all 587 victims. The record lacks evidence to support the court's assumption that "the mailings preceding the sale of the packages were sent to persons of very limited means." Id. Although one expert testified that persons whose assets consisted of only a house and a car generally would not need a living trust and the trust package would have no educational value to them, Applee. Supp. App. at 53-54, we cannot determine from the record that the 580 non-testifying victims fell within that category.

---

[3]The court's written findings also reflect its concern that none of the victims had the financial "wherewithal" to take advantage of the vacation coupons. R 1, doc 36, at 3.

Ordinarily, we would remand to allow the district court to correct its error. In this unusual case, however, a remand is unnecessary. The district court found as a matter of fact that the fair market value of the trust package and vacation coupons was zero. The record contains ample evidence to show that, under an objective standard, the fair market value of the trust package and vacation package is zero. Purchasers of the trust package could not actually create a trust for themselves; instead, they would need to hire an attorney to finalize the trust, R. 6 at 54-56. As for the educational value of the trust package, one expert testified that the information contained in the trust package could be obtained at free educational seminars. Applee. Supp. App. at 59. The company that marketed the vacation coupons went out of business in 1992, rendering the coupons worthless. R. 6 at 30. Also, the vacation coupons were severely restricted and could not be resold. Applee. Supp. App. at 92-93. After considering the entire record, we must agree with the district court's finding, that the trust package and vacation package lacked any marketable value.

V. Consideration of testimony from co-defendant's trial

In sentencing all three defendants, the district court relied on the testimony of victims who testified at defendant Fitzpatrick's trial. Defendant Sefic complains that he was deprived of the opportunity to confront and cross-examine those witnesses. This court has already decided that no constitutional, statutory, or procedural rule bars consideration of relevant and reliable testimony from another trial to determine a defendant's punishment. United States v. Beaulieu, 893 F.2d 1177, 1179 (10th Cir.), cert. denied, 497 U.S. 1038 (1990). The district court did not err in considering testimony from Fitzpatrick's trial when sentencing Sefic.

12

We AFFIRM defendant Fitzpatrick's convictions. We also AFFIRM each defendant's sentence.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge

Nos. 95-1417, 95-1426, 95-1442,
United States v. Fitzpatrick, Tafoya, and Sefic

**HOLLOWAY, Circuit Judge, concurring in part and dissenting in part:**

I join the persuasive majority opinion on all issues relating to the convictions of defendant Fitzpatrick and also agree there was no error in considering testimony from Fitzpatrick's trial in sentencing defendants Sefic and Tafoya, who pled guilty.[4]  I am, however, unable to agree to affirm the sentences imposed on the defendants and must respectfully dissent to that extent.

The critical point is that the government had the burden of proving by a preponderance of the evidence that the total loss to the victims amounted to more than $200,000 to justify the eight-level enhancement used in sentencing these defendants. USSG § 2F1.1(b)(1).  United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991).  We have held that in this context "loss" means net loss.  United States v. Gennuso, 967 F.2d 1460, 1462 (10th Cir. 1992);  United States v. Smith, 951 F.2d at 1167.  Thus the government bore the burden of proving the value, if any, of what was received by the victims in order to establish their net loss, as opposed to gross loss.

Here, the trial judge found that the value of both the living trust materials and the vacation packages was zero.  11 R. at 24-26.  He found further that the gross loss of all the 587 victims was $206,592, 11 R. at 22, which is based on the number of victims;  the judge found that there were at least 587 identifiable victims.  11 R. at 22.  They paid an average of $369 each for the trust materials and vacation packages.  These findings are not challenged in these appeals.  Under USSG § 2F1.1(b)(1), the offense level for each defendant was increased by eight in the trial court on the basis that the total loss of the

---

[4]As the majority opinion notes, defendants Sefic and Tafoya entered guilty pleas.

victims was found to be more than $200,000.  If that total had not been found to be more than $200,000, as recommended by the PSR (to which the government did not object), then the increase based on the enhancement would have been seven levels instead of eight.

Thus the critical issue is whether the government carried its burden of proving by the preponderance of the evidence that the value of the trust packages and the vacation coupons received by the victims was less than $6,592, thus making the total loss to the victims amount to over $200,000.  Only if it was established by the government's proof that the value of the trust materials and vacation coupons for all the victims was less than $6,592 was the government entitled to the eight-level enhancement.  The bottom line is that if the trust packages and the vacation coupons, or the two in combination, received by the 587 victims were not proved to have a value of as little as $11.23 to the victims, then the defendants are entitled to be resentenced with their offense level reduced by one.  This $11.23 amount is arrived at by dividing $6,592 (the amount by which the gross loss was found to exceed $200,000) by the number of victims, 587.  I am convinced that the government failed to prove this minimal $11.23 value, which was its burden.

The majority's determination that the trust packages had no educational value is based only on the evidence that attorneys sometimes give free seminars at which "the information contained in the trust package could be obtained . . . ." *Ante* at 12.  The majority's determination on this point is unsupported by the record because the witness on this question testified only that seminars are sometimes given without charge, not that the information presented there is equivalent to that contained in the trust packages.  The witness admitted he had not attended any of the trust seminars and thus he could not

2

compare the contents of the trust packages with the information presented at free seminars. 10 R. at 61.

More importantly, evidence that free seminars are given is irrelevant; it does not support the conclusion that the information in the trust packages is worthless because free seminars are, as the same witness testified, promotional tools intended to attract clients for the attorneys presenting the seminars. Id. at 61-62. That a product or service may be given away for promotional purposes does not mean that the product has no value. To the contrary, promotional programs sometimes give away objects of considerable value.[5] We cannot say that a luxury automobile is without value because similar cars are sometimes given as prizes in promotional efforts. The critical point is that no witness testified that the trust packages had no value, other than in response to hypothetical questions regarding the subjective value to a person with extremely limited assets for whom a living trust would be of no real benefit. The majority rightly rejects the trial judge's wholly unsupported finding that all 587 victims had no need for a living trust.[6] The majority errs, however, by ignoring the evidence which was before the district judge that the trust packages had some value.

Testimony on this issue was presented at the trial of Fitzpatrick as well as at the sentencing hearing, which was a joint proceeding for all three defendants. At the Fitzpatrick trial, the government presented the testimony of attorney Robert Smith, a

---

[5]This is a matter of such common experience that the term "loss leader" appears in dictionaries. See, e.g., Random House Dictionary of the English Language 1137 (2d ed. 1987).

[6]Only seven victims testified at trial and none testified at the sentencing hearing. The trial judge made an unsupported assumption from the limited trial testimony of the seven witnesses that all 587 victims' circumstances were such that they did not need a living trust. I agree with the majority that we must reject this unsupported assumption of the trial judge.

professor at the University of Denver College of Law who specialized in trusts and estates. 6 R. at 44. Professor Smith was proffered without objection as an expert in estate planning. Id. at 48. He reviewed the trust package and concluded that at least some of it had been prepared by an attorney. He found mistakes in the materials and opined that their usefulness was limited. However, at no point did he opine that the materials were of no value, nor did he testify to any specific value of the materials. To the contrary, he several times admitted that the materials did have some value, despite their shortcomings. 6 R. at 65, 66. It should be noted that the government's apparent purpose in presenting this testimony at trial was to establish that the materials were worth less than the victims had paid for them (which as the majority notes was in most cases $369) and that the materials were, contrary to the representations made by the telemarketers, inadequate to enable the users to produce effective legal documents. Professor Smith's testimony supported those conclusions. However, the government introduced no evidence at trial and none at the sentencing hearing to show that the value of the trust packages was zero or less than the critical $11.23 to the individual victims, which was required of the government.

Professor Smith did testify that many materials were available, including several books in most bookstores, instructing on disposition of property at death. He said he had found 20 to 25 books, of which he had brought two examples, which had sold at retail for $19.95. Id. at 57-61. Smith said that a number of these books were considerably better than materials in the trust packages. He then estimated that the trust package materials "are worth, really, a good bit less than the materials that I purchased for $19.95 . . . ." Id.

at 62.  However, neither Professor Smith nor any other witness ever testified what the lesser value of the trust package material was to the victims.[7]

I have not found, nor have the parties directed us to, any other testimony at trial regarding the value of the trust packages.  At the sentencing hearing, the government put on one witness, Arthur Mendez, a special agent with the IRS.  Mendez identified 587 victims and calculated their total losses to be $206,592.  His testimony was primarily directed toward establishing the gross loss, *i.e.*, the amount paid by all the victims.  Agent Mendez also computed a figure of $167,263 for net loss, 10 R. 23-24, but in doing so he simply used the figures provided by the prosecution, which apparently came from the PSR.  These figures were $50 of value for the trust packages and $17 of value for the vacation coupons.  These figures had been stated by defendant Sefic to be the wholesale prices paid by American Estate Planners.  10 R. at 22-23.  While testifying for the government at trial, Sefic said the living trust packages were bought in Texas;  for the packages his group paid "as little as $25, and we paid more at first, and it varied;  around 25 bucks."  6 R. at 182.

In sum, the lowest value attributed to the trust packages was given by Professor Smith.[8]  While Smith said the materials "would have a very slight value" and would give

_____

[7]I note that Professor Smith testified with respect to the materials included in the trust package that "there is some information in it that might be useful to virtually anyone . . . ."  Id. at 65.

[8]Professor Smith testified about deficiencies in the materials.  He was asked how much more it would take of an attorney's time to actually prepare a trust for a client after the client had gone through the forms.  The professor responded:

A       It's difficult to be precise about the amount of time.  It would depend very

(continued...)

5

[8](...continued)

much on the types of assets that the particular client owned, and what disposition they wanted to make, and whether or not their family was one that was very harmonious and got along, or whether their family was one where there were, perhaps, some difficulties among family members;  an unhappy child, or perhaps, as I've described before, a second marriage situation, where, unhappily, sometimes in the second marriage there are tensions within the family.

But, on average, I would say that to do a good job of sort of filling the gaps in the questionnaire, by getting information about assets and debts, by getting much more detailed information about what the family situation and the way the family members relate to one another, and, particularly, to get a much more crisp idea of exactly how the client would want to dispose of their property, I would think that, on average, you'd be talking somewhere between two to three hours of attorney time to get that information and then produce the documents as well.

Q      Now, sir, is this package that you have reviewed, with the videotape and the materials, helpful for estate planning for a gentleman who makes $170 take home a week, and owns a house and two cars of at least or less than a $50,000 value?

A      A total is less?  I'm sorry, may I ask a question?

Q      His value or his worth, with his home and his two automobiles, is approximately $50,000.

A      These materials would be of very minimal use to that kind of person.  The reason that I say that are, first of all, the materials, because they don't provide--you don't end up actually having any document that will dispose of your property when you've read these materials and filled out the blanks in them, so the person is still going to have to get some additional help to get that done.

Further, when the person has read these materials, they'll have a little better sense, certainly, of the options available to them to dispose of their property than they might have had before they read the materials.  On the other hand, because several of the methods of disposing of property at death that are described in these materials are inaccurate, are not accurately described, or are inaccurately described, you know, a person could certainly get the wrong idea about how to dispose of their property from these materials, and perhaps take on or engage a much more complex method than is necessary for tem, and, therefore, really end up with a plan that doesn't suit their particular needs.

So, I would say these materials would have a very slight value.  A person might have at least a better idea of the different methods that are available to dispose of property at death, but they would not have a very crisp idea of the advantages and disadvantages of each of those methods, and they would not have gotten anything that would, in fact, actually dispose of their property for them.

(continued...)

6

"a better idea of the different methods that are available to dispose of property at death," he never estimated what the minimal value was, and never testified that it was less than the critical $11.23 to the victims, which proof was essential to justify the eight-level enhancement. Because the government failed to meet its burden of proof for the eight-level enhancement, I am unable to join in an affirmance of the sentences. The government's proof goes no further than suggesting that the trust packages might be worth less than $19.95 each, and clearly fails to establish that the 587 trust packages bought by the victims had a value of as little as $11.23.[9] The finding of the trial judge that "the value of the living trust package was zero . . . ," 11 R. at 24, is thus without factual support in the record and, reviewing all the evidence, I am left with the definite and firm conviction that a mistake has been made. LeMaire By And Through LeMaire v. United States, 826 F.2d 949, 953 (10th Cir. 1987). Since the record does not support the essential finding on the trust packages' value, that failure itself is fatal to any calculation

---

[8](...continued)
6 R. 54-56.

[9]I note that in the appeals of Sefic and Tafoya, Tafoya and the government recite in their briefs that in the Plea Agreement and Statement of Facts Relevant To Sentencing submitted to the district court with respect to each, there is a statement regarding the testimony which Professor Smith would have given had these defendants proceeded to trial. In both cases, this statement is that Professor Smith "would testify . . . that similar material could be purchased at a local bookstore for $7 to $10." Sefic App. at 20; 1 R. Doc. 14 at 7. In both submissions it is also noted that the defendant disputed that assertion.
Although the government notes this fact in its statement of the facts, the government does not mention it in its argument; indeed, the government does not in any of these appeals even refer to Professor Smith's trial testimony. I do not think the sentencing judge could reasonably rely on this disputed contention about Professor Smith's expected testimony, when Smith had actually testified on precisely this point at some length in Fitzgerald's trial without ever specifying any range of values below $19.95.

7

that the victims' losses amounted to more than $200,000.  Thus it is not necessary to deal with the possible value of the vacation packages.

Accordingly, I respectfully dissent as to the sentences imposed and would remand for the district judge to sentence the defendants on the basis of a loss of not more than $200,000 to the victims.[10]  Otherwise, I concur in the majority opinion.

---

[10]The defendants make only the one argument I have addressed -- that the government failed to carry its burden of proving that the victims' losses amounted to over $200,000.  They do not contend that the losses amounted to less than $120,000 for the next lower enhancement under USSG § 2F1.1(b)(1).